BANCO DE MEXICO, as Trustee for Fondo de Garantía y Fomento para las Actividades Pesquera and Fondo Especial de Asistencia Técnica y Garantía para Créditos Agropecuarios, Plaintiff,

v.

ORIENT FISHERIES, INC. dba OFI Markesa International, Defendant.

Case No. CV 07–7043 GAF (AJWx).

United States District Court, C.D. California.

Sept. 2, 2010.

Bita A. Karabian, Schiff Hardin LLP, Los Angeles, CA, Daska P. Babcock, James R. Balich, Robert B. Mullen, Schiff Hardin, San Francisco, CA, for Plaintiff.

Aaron P. Rudin, Calvin E. Davis, Gordon & Rees LLP, David L. Prince, David L. Prince Law Offices, Los Angeles, CA, for Defendant.

## MEMORANDUM & ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON REMAINING CLAIMS

GARY ALLEN FEESS, District Judge.

### I. INTRODUCTION & BACKGROUND

The present motion involves a financial transaction that, in execution, was quite complex, but can otherwise be described in relatively simple terms.[1]

■ Orient Fisheries, Inc. ("OFI"), a United States company engaged in the business of importing shrimp from Mexico, sought to insure itself of a reliable supply of product by financing the operation of Mexican shrimp boat operators. To accomplish this objective, it arranged to have its Mexican agent, Habaire S.A. de C.V. ("Habaire"), enter into a financing agreement with two Mexican commercial banks, Banco Invex, S.A. ("Invex") and Ixe Banco, S.A. ("Ixe"), who would supply a trust vehicle (the "SPV") with funds that Habaire would use to make working capital loans to shrimp boat operators (the "Habaire Servicing Agreement"). (Second Am. Compl. ("SAC"), Ex. B.)[2] OFI undertook to indemnify the SPV and its trustee,

---

1. The factual background in this case is laid out in considerable detail in the Court's January 21, 2010 order, and therefore does not require substantial repetition here. (*See* Docket No. 229.)

2. OFI claims Banco de México failed to authenticate the Habaire Servicing Agreement. "The foundation is laid for receiving a document in evidence by the testimony of a witness with personal knowledge of the facts who attests to the identity and due execution

Banco J.P. Morgan ("J.P. Morgan") against Habaire's default on certain of its obligations under the Habaire Servicing Agreement.

Habaire would oversee the preparation of the boat operators' loan documentation, arrange for the transfer of funds from the SPV to the boat operators, and would repay the loans out of revenues generated by the sale of shrimp received from the shrimp boat operators. If all worked as planned, the catch would generate enough money to repay the loans, provide the boat operators with a profit, and provide OFI with a supply of Mexican shrimp. Despite the inherent uncertainty associated with the shrimp harvest, Invex and Ixe were willing to make these somewhat risky loans because (1) OFI agreed to indemnify the SPV in the event of Habaire's default, and (2) the loans were insured by a Mexican government guarantee program.[3]

While this program was successful for approximately two years, Habaire began experiencing cash flow problems in 2006 and ultimately defaulted on its repayment obligation in December 2006. Invex and Ixe declared Habaire in default and called the loans. (Bañuelos Decl. ¶ 5, Ex. 1 [Jan-

uary 4, 2007 letter]; Moreno Decl. ¶ 6, Ex. 3 [January 2, 2007 letter].) When Habaire failed to respond to the demand for payment, and J.P. Morgan was therefore unable to extend the sums owed, Invex and Ixe made a demand on Banco de México, the trustee for the government guarantee program, and were paid a total of approximately $5.5 million. (*See* Pedraza Decl. ¶ 19; Babcock Decl., Ex. 5 [Soto Decl. ¶ 36]; Bañuelos Decl. ¶ 6, Moreno Decl. ¶ 7.) Upon obtaining all relevant rights under the Habaire Servicing Agreement, Banco de México then filed this lawsuit seeking reimbursement from OFI under the agreement's indemnification provision.

In an attempt to conclude all matters remaining in this case, Banco de México now moves for summary judgment on its claims for indemnification and illegitimate enrichment. Considering the evidence as a whole, and OFI's failure to produce sufficient evidence creating a genuine issue of material fact for trial, the Court **GRANTS** summary judgment to Banco de México regarding its claim for indemnification. As Banco de Mexico's claim for illegitimate enrichment is asserted in the alternative, the claim is **DISMISSED.**[4]

---

of the document and, where appropriate, its delivery." *United States v. Dibble,* 429 F.2d 598, 602 (9th Cir.1970). Pedraza indicates that he "supervised the drafting of the contracts that implemented the FIRA structured financing program for Habaire in 2004." (Pedraza Decl. ¶ 3.) He "reviewed the original of the Servicing Agreement, which remains in FIRA's custody," and declared, under penalty of perjury, that the "document attached with Exhibit B to the Second Amended Complaint is a true and correct copy of the Servicing Agreement." (*Id.*) Pedraza's declaration is clearly sufficient to authenticate the document, and OFI has not presented any evidence showing that the document was forged, altered, or improperly executed. OFI's admissibility objection is **OVERRULED.**

3. Fideicomisos Instituidos en Relación con la Agricultura ("FIRA") is a government lending program whose goal is to encourage commer-

cial banks to lend to small businesses in Mexico's agricultural and fishing industries. (Babcock Decl., Ex. 5 [Soto Decl. ¶ 2].) Fondo Especial de Asistencia Técnica y Garantía para Créditos Agropecuarios ("FEGA"), a FIRA trust, offers financial guarantees to protect the participating commercial banks from default by the designated loan administrators. (*Id.* [Soto Decl. ¶ 6].) As discussed *supra,* Banco de México served as trustee for FEGA.

4. When Banco de México filed its initial motion on May 17, 2010, it inadvertently failed to translate Exhibits 20 and 21 of the Babcock Declaration. Ten days later, Banco de México requested leave to supplement its papers with translated versions of the exhibits and an additional declaration from Enrique Soto, FIRA's Subdirector of Investment Banking, authenticating the exhibits. (Docket No. 264.) OFI received ample time to respond to

## II. DISCUSSION

### A. RULE 56 LEGAL STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Thus, when addressing a motion for summary judgment, the Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See id.* at 256, 106 S.Ct. 2505.

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all "justifiable inferences" are drawn in that party's favor. *Id.* at 255, 106 S.Ct. 2505. Where there is no evidence demonstrating the existence of a genuine issue of material fact, the moving party may prevail simply by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Supreme Court has emphasized, "[w]here the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the

material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### B. APPLICATION

#### 1. STATUTE OF LIMITATIONS

In Mexico, the statute of limitations for actions to enforce a commercial or mercantile agreement is ten years. *See* Código Civil Federal [C.C.F.] [Federal Civil Code], art. 1047 (Mex.).[5] The Habaire Servicing Agreement qualifies as a commercial agreement because J.P. Morgan and Habaire are merchants, C.C.F., art. 3, and the Habaire Servicing Agreement's subject matter is commercial in nature. *See* C.C.F., art. 75. As OFI offers no opposition on this point, the Court concludes that Banco de México's present action is not barred by the applicable statute of limitations, and was therefore timely filed.

#### 2. THE HABAIRE SERVICING AGREEMENT IS A VALID CONTRACT

Under Mexican law, there are two requirements for the existence of a contract: (1) consent; and (2) an object which can be the subject matter of the contract. C.C.F., art. 1794.

---

these translated exhibits, especially in light of the Court's order providing OFI with an extension of time to file an opposition (Docket No. 263.), and has not shown any evidence of prejudice. Banco de México's request is **GRANTED**.

5. Citations to the Mexican Civil Code and Mexican Commercial Code are made pursuant to translations in JORGE A. VARGAS, THE FEDERAL CIVIL CODE OF MEXICO: BILINGUAL EDITION (Thomson West 2005) and JORGE A. VARGAS, MEXICAN COMMERCIAL CODE ANNOTATED: BILINGUAL EDITION (Thomson West 2005). The parties do not dispute the validity of the translations.

### a. Consent

In Mexico, consent may be manifested in writing. C.C.F., art. 1803. In this case, to further its business interests in Mexico, OFI assigned its Vice President, Raul Gutierrez ("Gutierrez"), to be in charge of its Mexican operations. (Statement of Genuine Issues ("SGI") ¶ 1; Babcock Decl., Ex. 1 [at 241, 251, 358, 621, 627].) OFI issued Gutierrez a general power of attorney authorizing him to initiate lawsuits and collections, conduct other administrative acts, and sign any type of contract on OFI's behalf.[6] (SGI ¶ 2; Babcock Decl., Ex. 3 [Power of Attorney].)

However, seeking to avoid summary judgment, OFI once again challenges the validity of Gutierrez's power of attorney. Although the power of attorney was (1) issued by OFI's president, Brent Church ("Church"), (2) notarized by OFI's parent company's in-house notary, (3) apostilled by the California Secretary of State for use in Mexico, and (4) ultimately delivered by OFI to a Mexican notary (see Reply at 5.), OFI argues—as it has in prior motion practice in this Court—that Gutierrez did not possess valid authority to execute the Habaire Servicing Agreement. In fact, OFI defends its position despite language in the Habaire Servicing Agreement which specifically references Gutierrez's authority to enter into the contract on OFI's behalf pursuant to the power of attorney at issue. (SAC, Ex. B, at 76.) Nevertheless, while the Court has addressed OFI's contentions, at length, in two prior orders, it shall address them briefly here.

### i. Gutierrez's Power of Attorney

██ OFI first argues that "full compliance" with the Washington Protocol is required in order for a power of attorney to be valid under Mexico law, (Opp. at 9; Rudin Decl., Ex. 26 [at 7–9]; Ex. 27 [at 4–8].), and cites language in the Washington Protocol which provides that the power of attorney "shall conform to the following rules . . . ." See Protocol on Uniformity of Powers of Attorney Which Are to be Utilized Abroad ("Washington Protocol"), Feb. 17, 1940, 56 Stat. 1376, O.A.S. T.S. 27. However, the Court previously addressed whether Gutierrez's power of attorney complied with the Washington Protocol, and concluded that any defects—to the extent there existed any—did not extinguish Gutierrez's authority to enter into contracts on OFI's behalf. (See 4/16/10 Order, Docket No. 240, at 3 (to the extent the power of attorney failed to include certain "technical details regarding the organization of OFI," those requirements appeared to have been designed to protect third parties dealing with the agent, and not the agent's principal).) "The information purportedly not included [in the power of attorney] was information that was readily known to OFI, which can hardly claim that the power's failure to include details regarding its own organization and operation somehow caused it any prejudice." (Id.) Moreover, the Court noted that OFI intentionally led third parties to believe that Gutierrez possessed authority to negotiate contracts on OFI's behalf, and could not avoid liability where the third party reasonably relied on the agent's ostensible authority. (Id.)

In a prior order, the Court also determined that OFI was estopped from arguing that the power of attorney was invalid, in part, because of several articles of the Mexican Commercial Code. (Id.) OFI now contends that the *Jurisprudencia* specifically provides that the Court shall look only to the Washington Protocol, and not to the Civil or Commercial Codes of Mexico, to determine the validity of the power of attorney. (Opp. at 9.) OFI's argument is flawed. The Court did not rely on the

---

**6.** OFI never revoked Gutierrez's power of attorney. (SGI ¶ 45.)

Commercial Code to determine the document's compliance with the Washington Protocol; rather, the Court referred to the Commercial Code in concluding that OFI was precluded from raising certain arguments regarding *invalidity.* Thus, the Court's reliance on the Commercial Code was applied to a separate issue—not the issue of whether the power of attorney actually complied with the Washington Protocol.

OFI further claims that its indemnity obligation under the Habaire Servicing Agreement is governed solely by Mexico's Civil Code, and therefore any arguments pertaining to the Commercial Code are inapplicable. (Opp. at 9; Rudin Decl., Ex. 28 [Fourth Maldonado Decl. at 3–4].) In the Court's order denying OFI's motion for reconsideration, the Court specifically relied on articles 321 (authority of agents), 2583 (ratification), and 2597 (continued liability until notice of revocation of authority) of the Mexican *Commercial Code* to conclude that principals are liable when a third party relies on the agent's ostensible authority. (4/9/10 Order, Docket No. 240, at 3.) OFI does not dispute the Court's conclusion, but instead attempts to preclude use of the Commercial Code when analyzing the Habaire Servicing Agreement.

In support of this argument, OFI relies on its expert, Antonio Maldonado, who contends that the indemnification clause of the Habaire Servicing Agreement is governed only by the Mexico Civil Code. However, during his deposition, Maldonado indicated that other portions of the Habaire Servicing Agreement were commercial in nature, and that he could not cite any provision of Mexican law that provided for some portions of a contract to be interpreted under the Civil Code and some portions under the Commercial Code. (Babcock Decl., Ex. 3 [Maldonado Depo. at 78–79].) Furthermore, Banco de México's expert, Carlos Loperena, testified that the "indemnification section of the contract is an ancillary contract to the commercial contract. And we say in Mexican law that the ancillary issues follow the same nature than [sic] the main issues of the contract." [7] (Babcock Decl., Ex. 4 [Loperena Depo. at 161].) In Loperena's opinion, an indemnification agreement, like the Habaire Servicing Agreement, is governed by the Commercial Code.[8] (*Id.* [at 157].)

In sum, OFI's present contentions fail to raise a genuine issue of fact regarding the validity of Gutierrez's power of attorney.

### ii. Ratification

■ In further support of the power of attorney's validity, there is substantial evidence in the record to persuade the Court that OFI ratified and approved Gutierrez's execution of the Habaire Servicing Agreement.

According to a October 28, 2004 unanimous resolution of OFI's Board of Directors, all actions of the company's officers—which included Gutierrez as Vice President—were "confirmed, ratified and

---

7. Under article 1050 of the Mexican Commercial Code, "[i]f in accordance with the mercantile laws a transaction has a commercial impact on one party and for the other party it is of a civil nature, the transaction shall be governed in accordance with mercantile law." Codigo de Comercio [Cód.Com.], art. 1050 (Mex.); *see also id.,* art. 75.

8. Under Mexican law, "[i]n mercantile agreements, each party assumes his obligation in the manner and terms he has chosen; the validity of the commercial transaction depends neither on compliance with formalities nor on specific requirements." Cód.Com., art. 78. Banco de México argues that the Habaire Servicing Agreement is a commercial contract and therefore does not require strict compliance with rules or formalities. (Mem. at 11.)

approved." (Babcock Decl., Ex. 18 [Unanimous Consent Resolutions of Board of Directors of Orient Fisheries Inc. in Lieu of 2004 Annual Meeting]; Babcock Decl., Ex. 2 [Kou Decl. at 317].) This resolution expressly ratified the acts of all of the company's officers through October 28, 2004—the Habaire Servicing Agreement was executed on June 4, 2004, more than four months earlier.

There is also no doubt that OFI knew of the present transaction. First, on July 16, 2004, Gutierrez emailed Church regarding an update of the financing program which involved J.P. Morgan as a fiduciary and Invex as a participating bank. (Babcock Decl., Ex. 16 [July 16, 2004 email chain]; SGI ¶ 46.) There can be no question that this refers to the transaction at issue in this case.

Second, in an October 6, 2004 email, Federico Nuñez, FIRA's attorney, explained various transaction details to Fred Vincent (an OFI consultant whose title was executive vice president for special projects). (Babcock Decl., Ex. 17 [Nuñez Decl. ¶ 23, Ex. 8].) Specifically, Nuñez wrote:

> As I explained to you yesterday on the phone, the trust to which Habaire transfers they [sic] rights of credits (disbursements from the line of credit opened by Habaire to the Producers documented on promissory notes) will grant Habaire a mandate in order to administer and collect such rights of credits; this means that any payment received or collected from the producers will come through Habaire which will have the obligation to transfer the funds to the trust. *In that agreement, Orient Fisheries, Inc. guaranteed the correct performance of Habaire in the fulfillment of their obligations.*

(Babcock Decl., Ex. 17 [Nuñez Decl. ¶ 23, Ex. 8] (emphasis added).) OFI has submitted no evidence that it contested this description of the agreement because no such evidence exists. This conclusion is confirmed by a December 23, 2003, letter from David Prince, acting as OFI's "general counsel," to Enrique Soto verifying certain information regarding OFI. (Babcock Decl., Ex. 15 [December 23, 2003 letter]; Babcock Decl., Ex. 9 [Prince Depo. at 260]; Rudin Decl., Ex. 2 [Prince Depo. at 258–59].) The letter demonstrates that Prince was providing this information specifically because he was aware of the FIRA financing arrangement.

### b. *Subject Matter*

■ Having resolved the issue of consent, the Court proceeds to address the subject matter of the Habaire Servicing Agreement. The object of a contract is either (1) the "subject-matter that an obligor is required to give," or (2) "the act that the obligor must or must not do." C.C.F., art. 1824. In Mexico, "[a] guarantee is a contract by which one person obligates himself to pay a creditor on behalf of a debtor if the latter fails to pay." C.C.F., art. 2794. "A guarantor may also obligate himself to pay money if the principal debtor does not perform a specific thing or act." C.C.F., art. 2800. "A guarantee may be made by operation of law, judicially created, or *by agreement,* gratuitous or for valuable consideration." C.C.F., art. 2795 (emphasis added).

Here, OFI's promise to indemnify the Habaire Trust upon Habaire's breach of its obligations under the Habaire Servicing Agreement clearly constitutes a guarantee. Under Mexican law, the guarantee constitutes the object of a valid contract.

### 3. STANDING

It is undisputed that Banco de México is not a party to the Habaire Servicing Agreement, and therefore must demonstrate it maintains standing to sue. Under Mexico law, an assignee of a contract stands in the shoes of the assignor and has

no greater rights than the assignor has under the contract. (SGI ¶ 82; Rudin Decl., Ex. 28 [Fourth Maldonado Decl. ¶¶ 9–10 (citing C.C.F., art. 2029) ].)

Here, Clause Twelve (2) [9] of the Habaire Servicing Agreement provides that "[J.P. Morgan] may assign its rights pursuant to the present agreement by means of a simple written notice it addresses to [Habaire]." (SAC, Ex. B., at 84.) "Notices shall become effective when they are actually received by the party to whom they are addressed . . . ." (*Id.* at 83.)

OFI contends there is no admissible evidence establishing that: "1) J.P. Morgan validly assigned its rights to [The Bank of New York] Mellon or Plaintiff under the terms of the Habaire Servicing Agreement in 2008; 2) notice of J.P. Morgan's assignment or transfer of rights was provided to Habaire in 2008; 3) Plaintiff received a valid transfer of rights from Mellon in May 2009; or 4) Plaintiff gave proper notice of the purported assignment by Mellon." (Opp. at 4.) The Court discusses each of these claims in turn.

### a. J.P. Morgan's Assignment to The Bank of New York Mellon

In 2006, J.P. Morgan and The Bank of New York conducted a swap of banking divisions: J.P. Morgan acquired the retail division of The Bank of New York, while The Bank of New York acquired the corporate trust division of J.P. Morgan. (Reus Decl. ¶ 2.) As a result of the swap, which became effective in 2008, all of J.P. Morgan's assets and rights held by the corporate trust division, including the rights under the Habaire Servicing Agreement, were transferred to The Bank of New York. (*Id.* ¶¶ 2–3.) In November 2008, pursuant to a merger (with Mellon Bank), The Bank of New York became The Bank of New York Mellon. (*Id.* ¶ 8.) As a result of this corporate restructuring, The Bank of New York Mellon "became the entity holding the rights under the [Habaire] Servicing Agreement." (*Id.*)

OFI has submitted evidence, including admissions on Banco de México's website, that J.P. Morgan continues to exist as a universal bank in Mexico authorized by Mexico's Ministry of Finance.[10] (Opp. at 7.) However, this fact, even if true, is of no moment. OFI's evidence only suggests that some residual entity named J.P. Morgan still exists; the evidence does not contradict the Reus Declaration, which explains that the rights under the Habaire Servicing Agreement *were* actually transferred. The Bank of New York Mellon clearly acquired certain trust rights from J.P. Morgan pursuant to the swap; whether the swap led to J.P. Morgan's complete dissolution is irrelevant. In sum, OFI's documents do not raise a genuine issue of fact regarding whether J.P. Morgan transferred its rights pertaining to the Habaire Servicing Agreement to The Bank of New York Mellon. The first of OFI's attacks fails.

### b. Whether Notice of J.P. Morgan's Assignment to The Bank of New York Mellon Was Provided to Habaire

The Court then considers OFI's second attack, where it contends there is no evi-

---

**9.** The Habaire Servicing Agreement contains two clauses bearing the heading TWELVE. (SAC, Ex. B, at 84.) The Court therefore distinguishes between the two by placing an additional marker (1) or (2) for the first and second clauses, respectively.

**10.** As of June 3, 2010, Plaintiff's website www.banxico.org.mx listed Banco J.P. Morgan, S.A. as a "universal bank" "currently authorized by the Ministry of Finance." (Rudin Decl. ¶ 12, Ex. 9.) In addition, a document dated March 2010 from Mexico's Ministry of Finance and Credit's website, www.shcp.gob. mx, indicates that Mexico's Federal Government has appointed Banco J.P. Morgan as a Co–Manager for the syndicated debt issuance of a new 30–year "udibono benchmark." (Rudin Decl. ¶ 13, Ex. 10.)

dence that notice of "J.P. Morgan's assignment or transfer of the rights was provided to Habaire in 2008." (Opp. at 4.) The record says otherwise. Banco de México has submitted evidence which demonstrates that The Bank of New York Mellon and J.P. Morgan indeed sent notices relating to the transfer of accounts to all parties within which J.P. Morgan was known to have contractual relationships. (Reus Decl. ¶ 7.) OFI has not presented any evidence that Banco de México failed to provide—or that Habaire did not receive—notice of the transfer. The second attack likewise fails.

### c. The Bank of New York Mellon's Assignment to Banco de México

OFI further challenges whether Banco de México received a transfer of rights from the Bank of New York Mellon. (Opp. at 4.) Here, the Bank of New York Mellon assigned its rights under the Habaire Servicing Agreement to Banco de México as trustee for FOPESCA and FEGA on May 13, 2009. (Pedraza Decl. ¶ 22, Ex. 7; Babcock Decl., Ex. 23 [Paredes Depo. at 102–105] (authenticating signatures).) The Assignment of Rights clearly transfers rights from The Bank of New York Mellon to Banco de México. There is no genuine issue of fact regarding this assignment in the chain.

### d. Whether Notice of The Bank of New York Mellon's Assignment to Banco de México Was Provided

■ Finally, the Court addresses whether Banco de México properly provided notice of The Bank of New York Mellon's assignment. (Opp. at 4.)

In Mexico, "[a]n assignment of a mercantile credit shall be legally binding on the *debtor* from the time that he is notified of the assignment in the presence of two (2) witnesses." Cod.Com., art. 390 (emphasis added). Here, Banco de México's representative, accompanied by two witnesses,

attempted to provide notice of the assignment of rights to Habaire in Mazatlán, but discovered that Habaire had vacated its premises without leaving a forwarding address. (Pedraza Decl. ¶ 24.) Habaire never notified FIRA of a new address. (*Id.* ¶ 25; Reus Decl. ¶ 7.) Habaire's departure to parts unknown without notice to the SPV or the trustee violates the terms of the Habaire Servicing Agreement. (*Id.*) Clause Twelve (1) of the Servicing Agreement expressly states:

> Any change of domicile that is made by one of the parties shall be notified to the other in writing to the domicile stated above. In the event of failure to do so, *notifications addressed to the last registered domicile shall have all their legal effects.*

(SAC, Ex. B, at 84 (emphasis added).) Habaire having abandoned its premises without notice to the other parties to the agreement, Banco de México's notification at Habaire's last registered address constitutes sufficient notice under the terms of the agreement.

Moreover, as Banco de México notes, its failure to locate Habaire is of "no legal consequence" because "the debtor" in this action is OFI, not Habaire. (Mem. at 16.) On May 15, 2009, OFI was served by mail with a copy of the assignment of rights from J.P. Morgan to Banco de México. (Babcock Decl. ¶ 2.) OFI does not dispute that it was served with a copy of the assignment. Thus, both Habaire and OFI received notice as required under the agreement, and that notice was in compliance with Mexican law.

### 4. BREACH OF THE HABAIRE SERVICING AGREEMENT

In Clause Eight of the Habaire Servicing Agreement, OFI promised "to indemnify [J.P. Morgan] regarding damages that may be suffered by the latter arising from

direct breach by [Habaire] ... of [its] obligations pursuant to the above *Clauses Four and Six* ...." (SAC, Ex. B, at 82 (emphasis added).) While Clauses Four and Six give rise to OFI's indemnity obligation under the contract, a brief look at other provisions of the agreement helps to illuminate OFI's obligations under Clauses Four and Six.

### a. Recitals and Clause Three

As part of the transaction, Habaire issued shrimp producers certain working capital loans—each loan is termed a "Credit Right." (SAC, Ex. B, at 74 [Recital (e) ].) According to the agreement, Habaire was required to transfer ownership "of the Credit Right and the Promissory Notes documenting the same" to J.P. Morgan pursuant to transfer agreements ("Transfer Agreements") that Habaire would list in accordance with Exhibit 1 of that agreement. (*Id.* [Recital (g) ].) The Credit Rights and Promissory Notes are referred to collectively as the Credit Rights in Trust. (*Id.*) Habaire was to "assume the role of manager and commission agent ... and perform collections and manage said Credit Rights on account of the Trust." (*Id.* [Recital (h) ].) With respect to those duties, Clause Three of the Habaire Servicing Agreement provides, in its entirety:

a) As long as the agreement remains in effect, [Habaire] shall *carry out the management and collection of each and every one of the Credit Rights in Trust and also the Promissory Notes* documenting said Credit Rights in Trust that at any time may form part of Exhibit 1, under the terms set forth in paragraph b) below.

b) For such effect, [J.P. Morgan] shall *issue to [Habaire] a list of the Credit Rights in Trust and the Promissory Notes documenting them each time a Transfer Agreement is executed* under the terms of the model that is included

as Exhibit 2. Said issuance shall be understood to have been carried out for the pertinent legal effects on the date in which [J.P. Morgan] has the updated aforementioned list arrive by means of one of the forms of notification set forth in clause Eleven below.

c) As of the date in which Commission Agent receives the updated list under the terms set forth, said updated list shall form an integral part of Exhibit 1 hereof.

(SAC, Ex. B, at 78 (emphasis added).)

In sum, the arrangement was to function as follows: Habaire would extend loan proceeds to shrimp producers; the loan would create a credit right in favor of Habaire; Habaire would manage and collect on the loan. Habaire would transfer the credit right to J.P. Morgan, as trustee for the SPV. The Habaire Servicing Agreement then indicates that *Habaire* would be required to update Exhibit 1 with information each time a Credit Right was created, and that *J.P. Morgan* would document each "transfer" in accordance with Exhibit 2 of the agreement.

### b. Clause Four—Safeguarding the Promissory Notes

Clause Four then provides that "[i]n order for [Habaire] to carry out on behalf of [J.P. Morgan] the custody, management and collection of the Credit Rights in Trust, and also the Promissory Notes documenting said Credit Rights in Trust covered by the [Habaire Servicing Agreement], [J.P. Morgan] shall, each time it executes Transfer Agreements, provide in deposit to [Habaire] ... the Promissory Notes documenting the Credit Rights in Trust together with a list of said Promissory Notes under the terms of the model that is included as Exhibit 2." (SAC, Ex. B, at 78.) Thus, Banco de México was required to deposit with Habaire the promissory notes documenting the credit rights, and therefore enable Habaire to

ensure that the notes retained their value.[11] (SAC, Ex. B, at 79.)

### c. Clause Six—Making the Actual Repayments

In Clause Six, Habaire agreed, *inter alia*, to collect funds due on the working capital loans and to make the funds available to J.P. Morgan at 11:00 a.m. on the next business day following the date of collection. (*Id.*, at 79.) "As long as any liquid amount or cash in the power of [Habaire] has not been duly credited ... [it] shall be liable for any loss, theft, forfeiture or any other deficiency of said amount or cash." (*Id.*, at 80–81.)

Habaire received structured financing through the FIRA program for the 2004–05 and 2005–06 shrimp harvesting seasons. (Bañuelos Decl. ¶ 3; Pedraza Decl. ¶ 4; Moreno Decl. ¶ 4.) During this period, Habaire participated in the program *without* default. (Bañuelos Decl. ¶ 3; Pedraza Decl. ¶ 4.) However, in December 2006, Habaire defaulted on its repayment obligation to the SPV. (Bañuelos Decl. ¶ 4; Pedraza Decl. ¶ 10; Moreno Decl. ¶ 6; Babcock Decl., Ex. 19 [Bañuelos Depo. at 165–66], Ex. 22 [Moreno Depo. at 17–20].)

OFI claims that Banco de México did not produce evidence that Habaire failed to collect on the Credit Right in Trust on specific amortization dates, that Habaire collected cash and shrimp but failed to credit J.P. Morgan for such amounts, or that the credit rights in trust existed in the first instance. (Opp. at 14.) According to OFI, Banco de México's witnesses cannot establish "1) what specific loan amounts were disbursed by J.P. Morgan to Habaire pursuant to the Habaire Servicing Agreement; 2) whether Habaire failed to repay J.P. Morgan amounts it received under the Habaire Servicing Agreement; 3) whether

Habaire breached any of its obligations to J.P. Morgan under the Habaire Servicing Agreement; and 4) the cause of any purported breach by Habaire." (Opp. at 18.)

However, OFI's effort to poke holes in Banco de México's case fail to create a genuine issue of material fact for trial. Banco de México *could have* produced such evidence in support of its present motion, but such evidence is not required. If "a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000) (citations omitted). "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548).

Thus, to meet its burden of production in this case, Banco de México was obligated to produce admissible evidence establishing that Habaire breached its obligation to repay the SPV. Viewing the record in its totality, the Court concludes that Banco de México has satisfied this burden. There is sufficient evidence in the record to conclude that Ixe and Invex transferred funds directly to J.P. Morgan, (*see* Moreno Decl., Ex. 2 [promissory notes showing disbursements from Invex to J.P. Morgan].), and that Habaire did not repay those funds pursuant to Clause Six of the agreement.

The evidence produced is summarized here:

### i. Habaire's Financial Condition

■ First the Court notes that even OFI tacitly concedes that Habaire was not repaying the loans and attempts to explain

---

11. Banco de México failed to produce evidence that J.P. Morgan deposited with Habaire a set of Promissory Notes. Without such evidence, Banco de México cannot establish that Habaire breached any obligation to manage and collect Credit Rights in Trust under Clause Four of the agreement.

the problem. For example, OFI presented evidence that:

"To the extent Habaire failed to repay any loans it received, it was a consequence of damage caused by Hurricane Lane to shrimp producers in September 2006, which resulted in the shrimp producers being unable to repay any loans they received."

(SGI ¶ 81.) As to that fact, OFI offers an unauthenticated letter from Gutierrez that refers to a single loan, worth approximately $315,000, for which repayment was delayed due to Hurricane Lane. (Rudin Decl., Ex. 18.) But the OFI's argument is beside the point—the issue is not why Habaire defaulted but whether it defaulted on its obligations. On that, there appears little question. That conclusion is further supported by correspondence between Habaire and Banco de Mexico (Gutierrez to Enrique Soto) acknowledging serious cash flow problems in 2006.[12] (Soto Decl., Exs. 1, 2.)

Gutierrez's first letter, dated January 20, 2006, informed Banco de México that farmed shrimp production—financed through Habaire—"has been displaced," and explains how, even though the value of product sent to OFI had a value of $6 million, only 10% was recovered. (Soto Decl., Ex 1.) Gutierrez then proposes a modification of the structure of the credit lines "in a flexible way" to prevent similar problems in the future. (*Id.*) Gutierrez's second letter, written in October 2006, relates to the payment of credits that were coming due that week. (*Id.,* Ex. 2.) He explains that Habaire's cash flows had been altered due to payments made to shrimp boat operators who had delivered a large volume of product, indicated that

Habaire maintained insufficient "lines" of credit or funds to "pledg[e]" more product, and therefore must "request an extension of the period by three months for the payment of said credits." (*Id.*) Based on these documents, the Court can easily and reasonably infer that Habaire faced liquidity-related issues and that it was not making timely payments.

### ii. Habaire Defaults

This evidence is bolstered by declarations from representatives of both Invex and Ixe who indicated that Habaire defaulted on its obligations under the Habaire Servicing Agreement in December 2006. (Banuelos Decl. ¶ 4; Moreno Decl. ¶ 6.) Moreover, Pedraza received reports from J.P. Morgan and FIRA personnel that Habaire had defaulted on its structured financing loans. (Pedraza Decl. ¶ 10.) This evidence demonstrates that Habaire failed to perform under the operative agreement.

Evidence in the record also establishes that Habaire's default was the direct cause for J.P. Morgan's failure to repay Invex and IXE. (Reus Decl. ¶ 4 ("As a direct result of Habaire's default, the Habaire Trust [SPV] was unable to repay the commercial banks, Ixe and Invex.").) Indeed, "[n]o one has repaid Habaire's debt to the Habaire Trust [SPV]." (*Id.* ¶ 5.) Furthermore, Banco de México has submitted letters from both Invex and Ixe to J.P. Morgan giving notice that the SPV had defaulted on its loan obligations. (Moreno Decl. ¶ 6, Ex. 3 [January 2, 2007 letter]; Bañuelos Decl. ¶ 5, Ex. 1 [January 4, 2007 letter to J.P. Morgan declaring the Habaire Trust [SPV] to be in default].); (Babcock Decl., Ex. 5 [Soto Decl. ¶ 32].) The letters informed J.P. Morgan that

12. OFI objects to the admission of these letters as inadmissible hearsay. According to OFI, Gutierrez drafted the documents as a representative of Habaire, not on behalf of OFI. OFI's attempt to pick-and-choose Gutier-

rez's employment status lacks merit. At all relevant times, Gutierrez served as Vice President of OFI, and his statements constitute party admissions. The objection is **OVERRULED.**

various amounts remained unpaid, and that because of J.P. Morgan's failure to repay the principal, the banks were demanding payment in full. (*See, e.g.,* Banuelos Decl. ¶ 5, Ex. 1.) The absence of any evidence from OFI, indicating that J.P. Morgan contested these letters, is telling. In short, J.P. Morgan failed to pay back the principal because it had not received any money from Habaire to meet its obligations, and OFI has offered no evidence of any sort to contradict that conclusion. No other reasonable inference may be drawn for the evidence in the record before this Court.

### iii. FEGA's Guarantee Payments

The record further contains clear evidence of FEGA's wire transfers—the guarantee payments—to Invex and Ixe. After J.P. Morgan's default on the underlying financing loans, Ixe and Invex accelerated the loans' maturity dates. As a result, Ixe and Invex demanded payment of the guarantees from Banco de México. (Bañuelos Decl. ¶ 5; Moreno Decl. ¶ 6, Ex. 3; Pedraza Decl. ¶ 19; Babcock Decl., Ex. 5 [Soto Decl. ¶ 36].) Banco de México, as trustee for FEGA, paid Ixe guarantee payments totaling $3,314,492.98 (Bañuelos Decl. ¶ 6, Ex. 2; Pedraza Decl. ¶ 19.), and paid Invex guarantees totaling $2,218.883.76.[13] (Pedraza Decl. ¶ 19, Ex. 5; Moreno Decl. ¶ 7.) In sum, the total amount paid to Ixe and Invex was $5,533,376.64. (Ray Decl. ¶ 7.)

As Banco de México explains: "the FEGA guarantees reimburse the commercial banks for monies that the J.P. Morgan trust has found itself unable to repay due to a default by the borrower, in this case, Habaire. FEGA pays its guarantees precisely because there is a loss by the trust."

(Reply at 7.) In sum, the guarantee payments were made because J.P. Morgan could not make its repayments to Invex and Ixe. Based on the evidence presented, the Court can infer that J.P. Morgan could not repay its obligations because Habaire, in breach of Clause Six of the agreement, failed to make certain loan repayments to J.P. Morgan.

### iv. Breach of Clause Nine of the Habaire Servicing Agreement

Banco de México also suggests that Habaire breached Clause Nine of the Agreement. Under Clause Nine of the Servicing Agreement, J.P. Morgan had the right to examine and review Habaire's accounts and financial information at any time. (SAC, Ex. B, at 82.) Habaire was required to prepare reports regarding the Credit Rights in Trust and collection activity and provide them to J.P. Morgan. (*Id.*)

That Gutierrez failed to produce Habaire's financial reports is not in dispute: On December 21, 2006, Pedraza, FIRA's Legal Director, and a representative from J.P. Morgan, among others, met with Gutierrez in Mexico. (Pedraza Decl. ¶ 10.) During this meeting, Gutierrez promised to provide a written report regarding Habaire's administration of the portfolio relating to the assets of the Habaire Trust and Habaire's compliance with its payment obligations under the Habaire Servicing Agreement. (*Id.* ¶ 11.) Gutierrez also claimed that he had all the necessary documentation, but would require time to compile the materials. (*Id.* ¶ 12.) Another meeting with Gutierrez was scheduled for December 27, 2006, but Gutierrez again indicated that he required more time to produce the report. (*Id.* ¶¶ 13–14.) Gutierrez never provided FIRA or J.P. Mor-

---

**13.** There are two wire transfers made to Invex: (1) $815,451.21 on December 13, 2006 and (2) $2,000,226.96 on February 14, 2007. (*See* Ray Decl., Ex. 2; Pedraza Decl., Ex. 5 [same].) However, Ray's calculations, while correctly using the first wire transfer for December 13, 2006, appear to use the amount $1,403.432.55 for the February 14, 2007 transfer. The Court cannot resolve this discrepancy.

gan with the requested report. (*Id.* ¶ 17; *see also* Reus Decl. ¶ 6 ("After defaulting in December 2006, Habaire never provided any loan documentation or report relating to the monies it received from the Habaire Trust to J.P. Morgan, the Bank of New York, or [The Bank of New York Mellon].").) Habaire's failure to provide documentation regarding the loans rendered it impossible for J.P. Morgan or Banco de México to determine whether any of the producer loans had been—or had not been—repaid. (Pedraza Decl. ¶ 18.)

OFI contends that even if Habaire's failure to provide reports constituted a breach of Clause Nine, the indemnity obligations did not include indemnification for Clause Nine and would not give rise to an indemnity obligation. While Clause Nine does not itself give rise to any form of indemnity obligation, evidence of Habaire's failure to prepare these reports further demonstrates its inability to comply with its obligations under the Habaire Servicing Agreement.[14]

### v. Conclusion re: Breach

■ Viewing the evidence in its entirety, the Court concludes that Banco de

México has met its burden of production in establishing Habaire's breach of the Habaire Servicing Agreement. Habaire's failure to make repayments directly caused J.P. Morgan, as trustee of the SPV, to be unable to repay Invex and Ixe. Because OFI was required to indemnify the SPV in the event of Habaire's default, Banco de México, standing in the shoes of the SPV, has established its claim for indemnity.

### 4. Whether Guarantee Payments Actually Pertained to Stage One Financing [15]

Finally, OFI argues that there is evidence that guarantee payments were made before the loans were actually declared in default. (Opp. at 18.)

OFI claims that Banco de México made guarantee payments totaling roughly $2.2 million to Invex on December 13, 2006 and December 22, 2006,[16] for loans that were not declared to be in default by either of the banks, and before Banco de México ever received a demand for the payment of such guarantees.[17] (Opp. at 18; Rudin Decl., Ex. 7 [Pl.'s Second Supplemental Responses, No. 12].) According to OFI,

---

14. Habaire's failure to maintain records in this case, and its rapid disappearance at the first sign of serious financial trouble, cannot be used by OFI as a shield to prevent Banco de México from obtaining summary judgment.

15. The working capital loans at issue in the present motion are part of a more complex loan arrangement, and were referred to as "Stage One" structured financing loans. (*See* Mem. at 3.) The arrangement also included inventory financing, which was referred to as "Stage Two" financing. (*Id.*) The Court previously ruled on motions pertaining to Stage Two financing issues.

16. Based on the record, there was no December 22, 2006 guarantee payment. Banco de Mexico concedes that its Second Supplemental Responses to OFI's Interrogatories contained the error, (*see* SGI ¶ 92.), but that no

such payment was ever made. Indeed, there is no evidence in the present motion regarding a wire transfer to Invex on that date. Banco de Mexico's damages expert, Daniel Ray, corrected the error in his Second Supplemental Report of August 19, 2008. (*See* Babcock Reply Decl., Ex. 8.) Nevertheless, the December 13, 2006 guarantee payment of $815,451.21 is accurate. (*See* Ray Decl., Ex. 2.)

17. While reasonable, Banco de México offers a hypothetical and unsubstantiated explanation: "The likeliest explanation is that the processing of individual FEGA guarantee payments is handled by a different bank department than the preparation of formal demand letters triggering accelerated maturities, and one department worked more quickly than the other through the holiday period of late December 2006 and early January 2007." (Reply at 7.)

the payment of guarantees prior to default creates a genuine issue of material fact as to whether the guarantee payments actually pertained to Habaire's financing obligations under the Habaire Servicing Agreement.

However, OFI's argument is foreclosed by the fact that Banco de México has provided wire transfer receipts for both Stage One financing and Stage Two financing. (Ray Decl., Exs. 1, 2; *see also* evidence for motion for entry of judgment regarding put option contract.) Therefore, there is no genuine dispute that the guarantee payments were made specifically with respect to the Habaire Servicing Agreement. Moreover, the fact that the guarantee payment to Invex was made approximately twenty (20) days before Invex officially declared Habaire in default does not create a genuine issue of material fact. OFI has not presented any evidence that the wire transfers were made for some other purpose or that the default somehow did not occur. *See Nissan,* 210 F.3d at 1103.

## III. CONCLUSION

Banco de México's motion for summary judgment on its indemnity claim is **GRANTED.** As the illegitimate enrichment claim is asserted in the alternative to the claim for contractual indemnity (Mem. at 18.), that claim is hereby **DISMISSED** as moot. Banco de México's separate motion for entry of judgment with regard to the Put Option Contract is also **DENIED** as moot.

Banco de México is **ORDERED** to prepare a proposed judgment, with supporting declarations regarding damages, no later than **Monday, September 20, 2010.**

**IT IS SO ORDERED.**