*374 Justice Scalia
delivered the opinion of the Court.
We consider whether a law enforcement official can, consistent with the Fourth Amendment, attempt to stop a fleeing motorist from continuing his public-endangering flight by ramming the motorist’s car from behind. Put another way: Can an officer take actions that place a fleeing motorist at risk of serious injury or death in order to stop the motorist’s flight from endangering the lives of innocent bystanders?
I
In March 2001, a Georgia county deputy clocked respondent’s vehicle traveling at 73 miles per hour on a road with a 55-mile-per-hour speed limit. The deputy activated his blue flashing lights indicating that respondent should pull over. Instead, respondent sped away, initiating a chase down what *375 is in most portions a two-lane road, at speeds exceeding 85 miles per hour. The deputy radioed his dispatch to report that he was pursuing a fleeing vehicle, and broadcast its license plate number. Petitioner, Deputy Timothy Scott, heard the radio communication and joined the pursuit along with other officers. In the midst of the chase, respondent pulled into the parking lot of a shopping center and was nearly boxed in by the various police vehicles. Respondent evaded the trap by making a sharp turn, colliding with Scott’s police car, exiting the parking lot, and speeding off once again down a two-lane highway.
Following respondent’s shopping center maneuvering, which resulted in slight damage to Scott’s police car, Scott took over as the lead pursuit vehicle. Six minutes and nearly 10 miles after the chase had begun, Scott decided to attempt to terminate the episode by employing a “Precision Intervention Technique (‘PIT’) maneuver, which causes the fleeing vehicle to spin to a stop.” Brief for Petitioner 4. Having radioed his supervisor for permission, Scott was told to “‘[g]o ahead and take him out.’” Harris v. Coweta Cty., 433 F. 3d 807, 811 (CA11 2005). Instead, Scott applied his push bumper to the rear of respondent’s vehicle.[1] As a result, respondent lost control of his vehicle, which left the roadway, ran down an embankment, overturned, and crashed. Respondent was badly injured and was rendered a quadriplegic.
Respondent filed suit against Deputy Scott and others under Rev. Stat. § 1979, 42 U. S. C. § 1983, alleging, inter alia, a violation of his federal constitutional rights, viz. use *376 of excessive force resulting in an unreasonable seizure under the Fourth Amendment. In response, Scott filed a motion for summary judgment based on an assertion of qualified immunity. The District Court denied the motion, finding that “there are material issues of fact on which the issue of qualified immunity turns which present sufficient disagreement to require submission to a jury.” Harris v. Coweta Cty., No. 3:01-CV-148-WBH (ND Ga., Sept. 23,2003), App. to Pet. for Cert. 41a-42a. On interlocutory appeal,[2] the United States Court of Appeals for the Eleventh Circuit affirmed the District Court’s decision to allow respondent’s Fourth Amendment claim against Scott to proceed to trial.[3] Taking respondent’s view of the facts as given, the Court of Appeals concluded that Scott’s actions could constitute “deadly force” under Tennessee v. Garner, 471 U. S. 1 (1985), and that the use of such force in this context “would violate [respondent’s] constitutional right to be free from excessive force during a seizure. Accordingly, a reasonable jury could find that Scott violated [respondent’s] Fourth Amendment rights.” 433 F. 3d, at 816. The Court of Appeals further concluded that “the law as it existed [at the time of the incident], was sufficiently clear to give reasonable law enforcement officers 'fair notice’ that ramming a vehicle under these circumstances was unlawful.” Id., at 817. The Court of Appeals thus concluded that Scott was not entitled to qualified immunity. We granted certiorari, 549 U. S. 991 (2006), and now reverse.
*377 II
In resolving questions of qualified immunity, courts are required to resolve a “threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer’s conduct violated a constitutional right? This must be the initial inquiry.” Saucier v. Katz, 533 U. S. 194, 201 (2001). If, and only if, the court finds a violation of a constitutional right, “the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case.” Ibid. Although this ordering contradicts “[o]ur policy of avoiding unnecessary adjudication of constitutional issues,” United States v. Treasury Employees, 513 U. S. 454, 478 (1995) (citing Ash-wander v. TVA, 297 U. S. 288, 346-347 (1936) (Brandeis, J., concurring)), we have said that such a departure from practice is “necessary to set forth principles which will become the basis for a [future] holding that a right is clearly established,” Saucier, supra, at 201.[4] We therefore turn to the *378 threshold inquiry: whether Deputy Scott’s actions violated the Fourth Amendment.
Ill
A
The first step in assessing the constitutionality of Scott’s actions is to determine the relevant facts. As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury, and respondent’s version of events (unsurprisingly) differs substantially from Scott’s version. When things are in such a posture, courts are required to view the facts and draw reasonable inferences “in the light most favorable to the party opposing the [summary judgment] motion.” United States v. Diebold, Inc., 369 U. S. 654, 655 (1962) (per curiam); Saucier, supra, at 201. In qualified immunity cases, this usually means adopting (as the Court of Appeals did here) the plaintiff’s version of the facts.
There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals.[5] For example, the Court of Appeals adopted respondent’s assertions that, during the chase, “there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and [respondent] remained in control of his vehicle.” 433 F. 3d, at 815. Indeed, reading the lower court’s opinion, one gets the impression that respondent, *379 rather than fleeing from police, was attempting to pass his driving test:
“[T]aking the facts from the non-movant’s viewpoint, [respondent] remained in control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns. He did not run any motorists off the road. Nor was he a threat to pedestrians in the shopping center parking lot, which was free from pedestrian and vehicular traffic as the center was closed. Significantly, by the time the parties were back on the highway and Scott rammed [respondent], the motorway had been cleared of motorists and pedestrians allegedly because of police blockades of the nearby intersections.” Id., at 815-816 (citations omitted).
The videotape tells quite a different story. There we see respondent’s vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit.[6] We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous *380 maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.[7]
At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a “genuine” dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, “[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no ‘genuine issue for trial.’ ” Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U. S. 574, 586-587 (1986) (footnote omitted). “[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.” Anderson v. Liberty Lobby, Inc., ATI U. S. 242, 247-248 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent’s version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied *381 on such visible fiction; it should have viewed the facts in the light depicted by the videotape.
B
Judging the matter on that basis, we think it is quite clear that Deputy Scott did not violate the Fourth Amendment. Scott does not contest that his decision to terminate the car chase by ramming his bumper into respondent’s vehicle constituted a “seizure.” “[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied.” Brower v. County of Inyo, 489 U. S. 593, 596-597 (1989) (emphasis deleted). See also id., at 597 (“If . . . the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect’s freedom of movement would have been a seizure”). It is also conceded, by both sides, that a claim of “excessive force in the course of making [a]... ‘seizure’ of [the] person ... [is] properly analyzed under the Fourth Amendment’s ‘objective reasonableness’ standard.” Graham v. Connor, 490 U. S. 386, 388 (1989). The question we need to answer is whether Scott’s actions were objectively reasonable.[8]
1
Respondent urges us to analyze this case as we analyzed Garner, 471 U. S. 1. See Brief for Respondent 16-29. We must first decide, he says, whether the actions Scott took *382 constituted “deadly force.” (He defines “deadly force” as “any use of force which creates a substantial likelihood of causing death or serious bodily injury,” id., at 19.) If so, respondent claims that Garner prescribes certain preconditions that must be met before Scott’s actions can survive Fourth Amendment scrutiny: (1) The suspect must have posed an immediate threat of serious physical harm to the officer or others; (2) deadly force must have been necessary to prevent escape;[9] and (3) where feasible, the officer must have given the suspect some warning. See Brief for Respondent 17-18 (citing Garner, supra, at 9-12). Since these Garner preconditions for using deadly force were not met in this case, Scott’s actions were per se unreasonable.
Respondent’s argument falters at its first step; Garner did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute “deadly force.” Gamer was simply an application of the Fourth Amendment’s “reasonableness” test, Graham, supra, at 388, to the use of a particular type of force in a particular situation. Garner held that it was unreasonable to kill a “young, slight, and unarmed” burglary suspect, 471 U. S., at 21, by shooting him “in the back of the head” while he was running away on foot, id., at 4, and when the officer “could not reason *383 ably have believed that [the suspect]. . . posed any threat,” and “never attempted to justify his actions on any basis other than the need to prevent an escape,” id., at 21. Whatever Gamer said about the factors that might have justified shooting the suspect in that case, such “preconditions” have scant applicability to this case, which has vastly different facts. “Gamer had nothing to do with one car striking another or even with car chases in general____ A police car’s bumping a fleeing car is, in fact, not much like a policeman’s shooting a gun so as to hit a person.” Adams v. St. Lucie County Sheriff’s Dept., 962 F. 2d 1563, 1577 (CA11 1992) (Edmondson, J., dissenting), adopted by 998 F. 2d 923 (CA11 1993) (en banc) (per curiam). Nor is the threat posed by the flight on foot of an unarmed suspect even remotely comparable to the extreme danger to human life posed by respondent in this case. Although respondent’s attempt to craft an easy-to-apply legal test in the Fourth Amendment context is admirable, in the end we must still slosh our way through the factbound morass of “reasonableness.” Whether or not Scott’s actions constituted application of “deadly force,” all that matters is whether Scott’s actions were reasonable.
2
In determining the reasonableness of the manner in which a seizure is effected, “[w]e must balance the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.” United States v. Place, 462 U. S. 696,703 (1983). Scott defends his actions by pointing to the paramount governmental interest in ensuring public safety, and respondent nowhere suggests this was not the purpose motivating Scott’s behavior. Thus, in judging whether Scott’s actions were reasonable, we must consider the risk of bodily harm that Scott’s actions posed to respondent in light of the threat to the public that Scott was trying to eliminate. Although there is no obvious way to quantify *384 the risks on either side, it is clear from the videotape that respondent posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase. See Part III-A, swpra. It is equally clear that Scott’s actions posed a high likelihood of serious injury or death to respondent — though not the near certainty of death posed by, say, shooting a fleeing felon in the back of the head, see Garner, supra, at 4, or pulling alongside a fleeing motorist’s car and shooting the motorist, cf. Vaughan v. Cox, 343 F. 3d 1323, 1326-1327 (CA11 2003). So how does a court go about weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person? We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that Scott confronted. Multiple police cars, with blue lights flashing and sirens blaring, had been chasing respondent for nearly 10 miles, but he ignored their warning to stop. By contrast, those who might have been harmed had Scott not taken the action he did were entirely innocent. We have little difficulty in concluding it was reasonable for Scott to take the action that he did.[10]
*385 But wait, says respondent: Couldn’t the innocent public equally have been protected, and the tragic accident entirely avoided, if the police had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best. Whereas Scott’s action — ramming respondent off the road — was certain to eliminate the risk that respondent posed to the public, ceasing pursuit was not. First of all, there would have been no way to convey convincingly to respondent that the chase was off, and that he was free to go. Had respondent looked in his rearview mirror and seen the police cars deactivate their flashing lights and turn around, he would have had no idea whether they were truly letting him get away, or simply devising a new strategy for capture. Perhaps the police knew a shortcut he didn’t know, and would reappear down the road to intercept him; or perhaps they were setting up a roadblock in his path. Cf. Brower, 489 U. S., at 594. Given such uncertainty, respondent might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow.* [11]
Second, we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people’s lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. The Constitution assuredly does not impose this *386 invitation to impunity-earned-by-recklessness. Instead, we lay down a more sensible rule: A police officer’s attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.
* * *
The car chase that respondent initiated in this case posed a substantial and immediate risk of serious physical injury to others; no reasonable jury could conclude otherwise. Scott's attempt to terminate the chase by forcing respondent off the road was reasonable, and Scott is entitled to summary judgment. The Court of Appeals’ judgment to the contrary is reversed.

It is so ordered.

 Scott says he decided not to employ the PIT maneuver because he was “concerned that the vehicles were moving too quickly to safely execute the maneuver.” Brief for Petitioner 4. Respondent agrees that the PIT maneuver could not have been safely employed. See Brief for Respondent 9. It is irrelevant to our analysis whether Scott had permission to take the precise actions he took.

 Qualified immunity is “an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.” Mitchell v. Forsyth, 472 U. S. 511, 526 (1985). Thus, we have held that an order denying qualified immunity is immediately appealable even though it is interlocutory; otherwise, it would be “effectively unreviewable.” Id., at 527. Further, “we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.” Hunter v. Bryant, 502 U. S. 224, 227 (1991) (per curiam).

 None of the other claims respondent brought against Scott or any other party are before this Court.

 Prior to this Court’s announcement of Saucier’s “rigid ‘order of battle,’ ” Brosseau v. Haugen, 543 U. S. 194, 201-202 (2004) (Breyer, J., concurring), we had described this order of inquiry as the “better approach,” County of Sacramento v. Lewis, 523 U. S. 833, 841, n. 5 (1998), though not one that was required in all cases. See id., at 858-859 (Breyer, J., concurring); id., at 859 (Stevens, J., concurring in judgment). There has been doubt expressed regarding the wisdom of Saueier’s decision to make the threshold inquiry mandatory, especially in cases where the constitutional question is relatively difficult and the qualified immunity question relatively straightforward. See, e. g., Brosseau, supra, at 201 (Breyer, J., joined by Scalia and Ginsburg, JJ., concurring); Bunting v. Mellen, 541 U. S. 1019 (2004) (Stevens, J., joined by Ginsburg and Breyer, JJ., respecting denial of certiorari); id., at 1025 (Scalia, J., joined by Rehnquist, C. J., dissenting). See also Lyons v. Xenia, 417 F. 3d 565, 580-584 (CA6 2005) (Sutton, J., concurring). We need not address the wisdom of Saucier in this case, however, because the constitutional question with which we are presented is, as discussed in Part III-B, infra, easily decided. Deciding that question first is thus the “better approach,” Lewis, supra, at 841, n. 5, regardless of whether it is required.

 Justice Stevens suggests that our reaction to the videotape is somehow idiosyncratic, and seems to believe we are misrepresenting its contents. See post, at 392 (dissenting opinion) (“In sum, the factual statements by the Court of Appeals quoted by the Court . . . were entirely accurate”). We are happy to allow the videotape to speak for itself See Record 36, Exh. A, available at http://www.supremecourtus.gov/opinions/ video/scott_v_harris.html and in Clerk of Court’s case file.

 Justice Stevens hypothesizes that these cars “had already pulled to the side of the road or were driving along the shoulder because they heard the police sirens or saw the flashing lights,” so that “[a] jury could certainly conclude that those motorists were exposed to no greater risk than persons who take the same action in response to a speeding ambulance.” Post, at 391. It is not our experience that ambulances and fire engines careen down two-lane roads at 85-plus miles per hour, with an unmarked scout car out in front of them. The risk they pose to the public is vastly less than what respondent created here. But even if that were not so, it would in no way lead to the conclusion that it was unreasonable to eliminate the threat to life that respondent posed. Society accepts the risk of speeding ambulances and fire engines in order to save life and property; it need not (and assuredly does not) accept a similar risk posed by a reckless motorist fleeing the police.

 This is not to say that each and every factual statement made by the Court of Appeals is inaccurate. For example, the videotape validates the court’s statement that when Scott rammed respondent’s vehicle it was not threatening any other vehicles or pedestrians. (Undoubtedly Scott waited for the road to be clear before executing his maneuver.)

 Justice Stevens incorrectly declares this to be “a question of fact best reserved for a jury,” and complains we are “usurping] the jury’s factfinding function.” Post, at 395. At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, see Part III-A, supra, the reasonableness of Scott’s actions— or, in Justice Stevens’ parlance, “[wjhether [respondent’s] actions have risen to a level warranting deadly force,” post, at 395 — is a pure question of law.

 Respondent, like the Court of Appeals, defines this second precondition as “‘necessary to prevent escape,’” Brief for Respondent 17; 433 F. 3d 807, 813 (CA11 2005) (quoting Garner, 471 U. S., at 11). But that quote from Garner is taken out of context. The necessity described in Gamer was, in fact, the need to prevent “serious physical harm, either to the officer or to others.” Ibid. By way of example only, Gamer hypothesized that deadly force may be used “if necessary to prevent escape” when the suspect is known to have “committed a crime involving the infliction or threatened infliction of serious physical harm,” ibid., so that his mere being at large poses an inherent danger to society. Respondent did not pose that type of inherent threat to society, since (prior to the car chase) he had committed only a minor traffic offense and, as far as the police were aware, had no prior criminal record. But in this case, unlike in Garner, it was respondent’s flight itself (by means of a speeding automobile) that posed the threat of “serious physical harm ... to others.” Ibid.

 The Court of Appeals cites Brower v. County of Inyo, 489 U. S. 593, 595 (1989), for its refusal to “countenance the argument that by continuing to flee, a suspect absolves a pursuing police officer of any possible liability for all ensuing actions during the chase,” 433 F. 3d, at 816. The only question in Brower was whether a police roadblock constituted a seizure under the Fourth Amendment. In deciding that question, the relative culpability of the parties is, of course, irrelevant; a seizure occurs whenever the police are “ ‘responsible] for the termination of [a person’s] movement,”’ 433 F. 3d, at 816 (quoting Brower, supra, at 595), regardless of the reason for the termination. Culpability is relevant, however, to the reasonableness of the seizure — to whether preventing possible harm to *385 the innocent justifies exposing to possible harm the person threatening them.

 Contrary to Justice Stevens’ assertions, we do not “assum[e] that dangers caused by flight from a police pursuit will continue after the pursuit ends,” post, at 394, nor do we make any “factual assumptions,” post, at 393, with respect to what would have happened if the police had gone home. We simply point out the uncertainties regarding what would have happened, in response to respondent’s factual assumption that the high-speed flight would have ended.