FILED
United States Court of Appeals
Tenth Circuit

May 20, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

LUIS TELLEZ, Personal Representative
for the Estate of Benjamin S. Tellez,
deceased,

        Plaintiff-Appellant,

v.

CITY OF BELEN; SERGEANT
GERALD ESPINOZA, a City of Belen
Police Officer, in his individual and
official capacities,

        Defendants-Appellees.

No. 13-2123
(D.C. No. 1:12-CV-00542-JCH-KBM)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, **PORFILIO**, and **BALDOCK**, Circuit Judges.

       Luis Tellez appeals from the district court's entry of summary judgment in

favor of defendants.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*]      After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I.  BACKGROUND

Defendant Gerald Espinoza is a sergeant with the Belen, New Mexico, police department.   In June 2010, he responded to a call received at 9:07 p.m. that two men were fighting and one of them had a rifle and was threatening to kill the other.  Those men turned out to be brothers—Benjamin and Andres Tellez—and the fighting occurred in front of Andres's house.  By the time Sgt. Espinoza arrived, Benjamin had managed to stab Andres in the arm with a full-sized spear and had chased him into the house.  After a brief encounter, Sgt. Espinoza fatally shot Benjamin once in the chest.

Benjamin's father, Luis Tellez, acting as the personal representative of Benjamin's estate, filed an action against Sgt. Espinoza and the City of Belen.  He asserted a claim under 42 U.S.C. § 1983 of excessive force in violation of the Fourth Amendment and a state-law claim of assault and battery.  Defendants moved for summary judgment, which the district court granted.  The court ruled that Sgt. Espinoza was entitled to qualified immunity on the § 1983 claim because he did not violate Benjamin's constitutional rights.  Absent a viable claim of individual liability, the court concluded that the claim of municipal liability against the City of Belen necessarily failed.  The court also held that the homicide was justifiable under N.M. Stat. Ann. § 30-2-6.

## II.  DISCUSSION

The district court set out a detailed account of the parties' stories, and we will not repeat it here.  This appeal turns primarily on one key question:  Did the district court err in excluding certain facts from affidavits Plaintiff submitted in response to the summary judgment motion?  Those affidavits were completed by Andres, who saw most of what happened from the front of his porch, and a neighbor, Gonzalo Jimenez, who witnessed the incident while backing his car out of a driveway some three hundred feet away.  In relevant part, the Andres affidavit responds to Sgt. Espinoza's testimony, who claimed that Benjamin was carrying a rifle, had disregarded orders to drop the weapon, had threatened to shoot him, and had begun to raise the rifle into a shooting position at close range.  Andres claimed that Benjamin had been carrying a yellow shovel but dropped it, did not have a gun or anything in his hands when the shot was fired, and did not threaten Sgt. Espinoza.

The district court ruled that Andres and Mr. Jimenez lacked personal knowledge of whether Benjamin had made the threat or had a gun.  In reaching that conclusion, the court considered the totality of the circumstances, including photographic and video evidence depicting, among other things, the lighting of the area and the location of the gun after the shooting; the affidavits of two other witnesses; and inconsistencies between unsworn statements Andres made during a police interview on the night of the incident and the affidavit he signed more than two years later.  Based on its review, the court determined that the averments of

Andres and Mr. Jimenez regarding the threat and the gun were not sufficiently grounded in the record and therefore not within the universe of disputed facts the court would consider in determining that Plaintiff failed to meet his burden to show a constitutional violation.

Our review is de novo. *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1311 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* at 1312 (internal quotation marks omitted). Generally, "facts must be viewed in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007). But that is the case "only if there is a 'genuine' dispute as to those facts." *Id.* Thus, at summary judgment, "a plaintiff's version of the facts must find support in the record." *Thomson*, 584 F.3d at 1312. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott*, 550 U.S. at 380. Hence, the "principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact" in the qualified-immunity context "is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court." *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring).

Here, the evidence clearly establishes that Benjamin had a rifle.[1]  The video shows the second officer arriving on the scene just after the shooting, exiting the car, and approaching Benjamin, who was lying in the next-door neighbor's driveway between the sidewalk and the street.  The officer then makes a comment about a gun and shines his flashlight on the sidewalk just above Benjamin's head.  The photographs show a rifle lying in that location and a red duffle bag Sgt. Espinoza claimed Benjamin was carrying over the rifle before he began to raise it up.  The video also shows officers beginning to rope off the area, a fact Andres admitted in his affidavit.

Also, Defendants provided the affidavits of two other neighbors.  They observed Benjamin arrive at Andres's house, take what looked like a rifle out of a coat or bag, and begin to threaten to kill Andres.  One of them called 911 as Benjamin chased Andres around the truck and into the house.  After yelling at Andres again from the sidewalk, Benjamin began to walk north toward them when Sgt. Espinoza arrived and began shouting at Benjamin.  Benjamin shouted back but did not drop the gun, instead turning toward Sgt. Espinoza in a threatening manner.  After a further exchange of words between the two, Sgt. Espinoza yelled "'Drop it!'" Aplt. App. at 37, 40, but Benjamin continued to hold the gun in a threatening manner.  One of the neighbors pushed the other behind their car and they heard a gunshot.

---

[1]      Apparently, the rifle was a pellet gun modified to look like a real rifle, but Plaintiff does not contend that this makes any difference.

When they looked back, Benjamin was staggering. One of them saw Sgt. Espinoza kick the gun away and order Benjamin to get on the ground.

Thus, the video and photographic evidence blatantly contradicts the statements of Andres and Mr. Jimenez that Benjamin did not have a gun, and the other neighbors' statements are consistent with that evidence. Nothing that is properly within the universe of facts on which we rest our legal conclusion controverts Sgt. Espinoza's account that he fired as Benjamin began to raise the rifle into a shooting position aimed at him.

This leaves us with the disputed question of whether Benjamin threatened to shoot Sgt. Espinoza. Sgt. Espinoza claimed that as he first approached, Benjamin shouted "'Fuck you motherfucker! Shoot me! Suicide by cop!'" *Id.* at 22. And, what appears to be just a few seconds later, Benjamin allegedly said, "I swear I'll shoot you! I swear I'll shoot you!" as he began to raise the rifle into shooting position. *Id.* at 24. Andres and Mr. Jimenez both acknowledged that Benjamin cursed at Sgt. Espinoza but claimed there were no threats, with Mr. Jimenez merely stating that he "did not hear Benjamin . . . yell or say anything to the officer before he was shot." *Id.* at 67.

Our treatment of this disputed fact turns on the legal standards applicable to Fourth Amendment claims of excessive force. "An officer using force in the course of a seizure of a citizen is entitled to qualified immunity unless the level of force violated clearly established Fourth Amendment law." *Thomson*, 584 F.3d at 1313.

- 6 -

We ask whether the officer's use of force was objectively reasonable "under a totality of the circumstances approach." *Id.* That approach requires us to "consider and balance the following factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Because "officers may have to make split-second judgments in uncertain and dangerous circumstances," *id.* (internal quotation marks omitted), we judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396.

Where, as here, deadly force is involved, reasonableness turns on whether "a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Thomson*, 584 F.3d at 1313 (emphasis and internal quotation marks omitted). Factors relevant to that inquiry include "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Id.* at 1314-15 (internal quotation marks omitted).

Here, it is undisputed that Sgt. Espinoza ordered Benjamin to drop the rifle, Benjamin was raising it into a shooting position, and there was a very short distance

between the two. Moreover, it is undisputed that Sgt. Espinoza recognized Benjamin from previous encounters where Benjamin had been violent before police arrival but compliant with police requests, but on the night of the shooting he was not complying with directions and was cursing at Sgt. Espinoza. It is also undisputed that Sgt. Espinoza knew Benjamin was a drug user based on Benjamin's prior statements that he used methamphetamine. Finally, it is undisputed that just before firing, Sgt. Espinoza heard Andres yell, "He just stabbed me! He just stabbed me!" Aplt. App. at 23. Given all these facts, and in particular Benjamin's act of raising the rifle into a shooting position at close range, we conclude that Sgt. Espinoza had sufficient probable cause to believe Benjamin was about to shoot him even if Benjamin did not make the verbal threats that Andres contests.

Our disposition of this appeal makes it unnecessary to reach a number of arguments Plaintiff advances, chief of which is that although the district court purported to strike the material portions of Andres's affidavit due to lack of personal knowledge, the court implicitly conducted an improper sham-affidavit analysis in relying on the contradictory story Andres told police investigators during his unsworn interview on the night of the shooting.[2] Although the district court was properly concerned about the significant differences between the two stories Andres

---

[2]    In *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986), we stated that we will disregard an affidavit submitted at summary judgment that contradicts the affiant's prior sworn testimony if it "constitutes an attempt to create a sham fact issue."

told, we have not relied on those differences in reaching our conclusions.[3]  Hence, we also do not address Defendants' argument that Plaintiff waived the sham-affidavit argument by not raising it in the district court.  Nor must we consider whether the district court erred in determining that it was too dark for either Andres or Mr. Jimenez to see whether Benjamin was carrying a rifle.

In sum, the district court did not err in excluding material portions of the affidavits of Plaintiff's witnesses that were so inconsistent with the other evidence in the record that no reasonable juror could have possibly relied on them to return a verdict in Plaintiff's favor.  Based on the remaining evidence, the court properly concluded that Plaintiff failed to meet his burden of proving a constitutional violation.  It was therefore appropriate to grant summary judgment to Sgt. Espinoza on the § 1983 claim on the basis of qualified immunity, and on the state-law claim because the shooting was justified under state law.  Lacking a constitutional violation, it was also appropriate to grant summary judgment in favor of the City of Belen on the claim of municipal liability.

The judgment of the district court is affirmed.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge

---

[3]  In relevant part, Andres told investigators that he could not hear what Benjamin yelled at Sgt. Espinoza and it was too dark to see what Benjamin was trying to pull out of his bag, which Benjamin picked up from the ground just before the shot was fired.