DENNIS JACOBS, Circuit Judge,
concurring in the judgment in part and dissenting in part:
I concur in the Judgment insofar as the majority affirms dismissal of the First Amendment retaliation claim and the claim for false arrest.
As to the claim of excessive force, the majority remands for a jury trial to determine whether the officers’ use of force, in restraining a suspect who was actively resisting arrest, was so objectively unreasonable that it violated the Fourth Amendment to the United States Constitution- and, accordingly, whether two officers of the New York City Police Department (“NYPD”) should be personally liable to her for money damages. From that regrettable decision, I respectfully dissent.
I
As the majority characterizes its recitation of the facts, those in dispute are presented “in the light most favorable to the Plaintiff, Imani Brown.” Maj. Op. at 95. But the only facts relevant to the use of force are undisputed, and are captured by high-quality video footage. The majority essentially concedes as much. See Maj. Op. at 101 (“Unusual for a claim of excessive force, most of the relevant facts are undisputed.”). As to the visual record, “[tjhere are no allegations ... that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.” Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Brown’s excessive force claim therefore must be considered at summary judgment “in the light depicted by the videotape.” Id. at 380-81,127 S.Ct. 1769.
Brown’s claim does not survive the witness of your eyes. Since I am “happy to allow the videotape to speak for itself,” id. at 378 n. 5,127 S.Ct. 1769,1 have made the footage available online.[1] A textual play-by-play of the video is supplied in an Appendix to this opinion. As to the use of force, the only source of the facts I rely upon (other than the video) is Brown’s own testimony.
The majority and I mostly agree on what happened in the prequel to the video. Around 5 a.m., the manager of a Starbucks in lower Manhattan called 911. The Starbucks had not yet opened, and people were banging on the glass demanding access to the bathroom. The coffee shop was five blocks from Zuccotti Park, where anti-Wall Street demonstrators had been camped for some days. Two NYPD officers were despatched to the Starbucks. They parked close by, and observed a group gathered in front of the coffee shop. Brown approached the police car and made known that she was among those seeking entry; specifically, she asked police guidance *105 about where she could find an open bathroom. Apparently, the police did not consider giving such advice to be among their duties. When Brown went back to the door, the police approached her. As the majority concludes, the police had at least arguable probable cause for arrest.
When the police asked her for identification, she balked, and thereby prevented the encounter from being resolved on the basis of a summons. When the officers then demanded that Brown present her hands to be cuffed for arrest, she again-balked, this time grabbing hold of a metal bar of the scaffolding erected in front of the store. The video begins there.
As the video evidences: Brown resisted arrest; the police subdued her using modulated, graduated levels of force; she was warned at each stage what measure would follow; she was spoken to with forceful professionalism throughout; the first short release of pepper spray was preceded by a warning; the pepper spray had no apparent effect on her resistance; she was warned that a further burst would be administered; she was undeterred; and only shortly after the second application did she allow her hands to be cuffed. After she complied, she was lead to the back seat of a police car; when she emerged a few moments later, her hands were no longer cuffed together. As she admitted at deposition, she fully understood the orders that she resisted:
Q. In sum and substance, were they telling you to give them your hands?
A. Yes.
Q. In sum and substance, were they telling you to stop resisting?
A. They did, yes.
Ex. F to Lucas Decl. (“Dep. of Imani Brown”), 52:25-53:5. That documented sequence of events is all that is needed to affirm summary judgment on the excessive-force claim.
The majority opinion does not actually question that storyline, but it injects criticisms of police technique and tone that seem to me mostly irrelevant, and awfully unfair:
• The majority compares Brown’s height and weight (and sex) to the height and weight (and sex) of the two policemen, with more than a suggestion that then-struggle to subdue her was unsporting and unehivalrous or (alternatively) insufficiently masterful and competent. See, e.g., Maj. Op. at 102 (criticizing the police for “taking a 120-pound woman to the ground and twice spraying her directly in the face with pepper spray”); see also id. at 101 (listing Brown’s and the officers’ height and weight). The size comparison sharply cuts the other way, of course. Brown was outnumbered by trained NYPD officers Who were bigger than she was: the easy inference is that, but for their professional restraint, they could have subdued her promptly and completely with effortless brutality.
• The majority cites the answers made by the NYPD officers to Brown’s request for guidance on local toilet facilities. One answered, “What do we look like, the potty police?” The other suggested she “piss in the park.” (Of course, as had been widely reported, Zuccotti Park had been turned into something like an open sewer by those who had been encamped there; so the police responses might be deemed a commentary on Brown and the others in her group. The police should be free to perceive irony from a self-imagined revolutionary against corporate America who was begging relief at Starbucks Corporation.) But rudeness or sarcasm (even excessive rude *106 ness or sarcasm) is not force, let alone excessive force.
• The majority faults the police for not resolving the encounter on the basis of a summons. But it was Brown’s refusal to identify herself that foreclosed that option. The majority thinks the police should have then explained why they wanted her name, and assumes (without basis) that it is “very likely,” Maj. Op. at 98, that the encounter would have resolved itself peacefully had this information been adequately communicated. But it was sufficiently obvious why the police wanted identification; she could scarcely have thought that they wanted to send her tickets to the policemen’s ball.
• The majority implies that the pepper spray was held too close to Brown, and that good policing technique would call for more distance. See Maj. Op. at 101 (citing the New York City Police Department Patrol Guide). But at least the first burst was issued when the officer holding the can was holding on to Brown at the same time, so that he could not have further distanced the spray-can without a selfie stick. In any event, we are not interpreting the NYPD Patrol Guide, but the United States Constitution, which has nothing to say about the optimal distance from which an officer should discharge pepper spray during a physical struggle. Moreover, the first discharge was insufficient to overcome resistance; the second eventually subdued her; and at the precinct afterward, she declined the opportunity to wash out her eyes.
• My colleagues lament that the whole episode could have been avoided if the police had done this or that, or used some other technique. Maj. Op. at 98, 98 n. 6, 102. But surely the but-for cause of the tussle was Brown, her refusal to give pedigree information needed for a summons, and her dogged resistance to the lawful arrest she had provoked by her violation of the law.
In summary, the police had probable cause to arrest; they were refused identification that could have obviated any physical encounter; and they applied modulated force and gave warnings in advance at each step, treating. Brown with all the courtesy a criminal suspect can reasonably ask for while physically resisting arrest. Moreover, the entire encounter, from first to last, apparently had little adverse effect on Brown, physically or psychologically. When she arrived at the police station, she explicitly refused medical assistance. Asked by a member of the Emergency Medical Services team if she wanted her eyes rinsed, Brown declined.
The day after her arrest, Brown was happily claiming the glamor of having spent a night in jail after resisting arrest. In an online chat with a friend, Brown gloated:
Friend: imanii you aiight?
Brown: yeah
Brown: I was maced and shit tho
Friend: woahh
Friend: u jusst refused to move?
Brown: yes it’s a long story
Brown: I resisted arrest
Ex. 1 to Supp. Decl. of Andrew Lucas. The next day, another friend asked Brown if she planned to return to the protests:
Friend: are you going to keep protesting?
Brown: of course
Brown: I just was going to lay low tonight
Brown: I was just released yesterday am *107 Brown: but now I’m regretting going home
Brown: I want to be out there!
Ex. 2 to Supp. Decl. of Andrew Lucas.
II
“The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest.” Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir.2010). In deciding whether a particular use of force was reasonable, we look to the totality of the circumstances, “including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham, v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Some of those factors might be helpful (or not) in a given case, but the ultimate question.is always the same: “whether the officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them.” Id. at 397, 109 S.Ct. 1865. In the end, “all that matters is whether [the officers’] actions were reasonable.” Scott, 550 U.S. at 383,127 S.Ct. 1769.
“[W]e are careful to evaluate the record ‘from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.’ ” Tracy, 623 F.3d at 96 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865). “ ‘Not every push or shove, even if it may later seem unnecessary in the peace of a judge’s chambers,’ violates the Fourth Amendment.” Graham, 490 US. at 396, 109 S.Ct. 1865 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.)).
Ill
Brown actively resisted throughout the process of her arrest.[2] For that reason— even that reason standing alone — the officers were permitted to use force to subdue her, as a matter of law: “[t]he fact that a person whom a police officer' attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer’s use of some degree of force.” Sullivan v. Gagnier, 225 F.3d 161, 165-66 (2d Cir.2000) (first emphasis added); see also Tracy, 623 F.3d at 97 (“Tracy appeared to fail to comply with a direct order and to instead actively resist arrest, thus necessitating a forceful response.”).
At the same time, resistance to arrest “does not give the officer license to use force without limit.” Sullivan, 225 F.3d át 166. When a suspect resists arrest, “[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer.” Id.
No reasonable jury could find an abuse in this case-let alone misconduct so unreasonable as to justify “personal liability” against Officer Justin Naimoli and Officer Theodore Plevritis, which, as this Court has said, is payable from the officers’ “savings, home equity, and [their children’s] college funds.” Gonzalez v. City of Schenectady, 728 F.3d 149, 162 (2d Cir.2013). The majority relies on what it calls “likely speculation” that “a payment, if any, will be made by the City after a settlement.” *108 Maj. Op. at 108 n. 15. Of course, we typically and appropriately adopt an attitude of complete indifference to the questions of (1) whether a case is likely to settle, and (2) what private arrangements, if any, defendants may have entered into to spread the (potentially ruinous) financial risk of an adverse civil judgment. The majority’s expectation that the City will both settle this case and then indemnify the officers may alleviate somewhat the danger of inflicting personal liability on the police officers; but it warps application of the legal standard, which ceases to be individual liability under section 1983. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (“Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through 'the official’s own individual actions, has violated the Constitution.”).
IV
The use of pepper spray was the climax of Brown’s encounter with the police, and ultimately ended her resistance. “Unquestionably, infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects.” Tracy, 623 F.3d at 98. That is of course its utility. “[A]s such, its use constitutes a significant degree of force.” Id. So “it should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer.” Id.
But Brown was not complying with the officers’ (lawful) commands — she was energetically resisting arrest. That fact, standing alone, will typically justify the use of significant force, including pepper spray. But here, the bursts of pepper spray were preceded by several minutes of physical resistance, repeated orders to “Stop resisting!”, and then specific warnings about pepper spray — “GIVE US YOUR HANDS, OR YOU’RE GONNA GET PEPPER SPRAYED RIGHT NOW! GIVE US YOUR HANDS!” — all of which failed to subdue Brown. And as Brown admitted at deposition, she understood the officers’ warning that she would be pepper sprayed a second time if she did not offer her hands. See Dep. of Imani Brown 54:21-24 (“Q: The second time you were pepper sprayed, did the officers warn you that if you did not give them your hands you would be pepper sprayed? A: Yes.”). The second burst of pepper spray was apparently the measure that worked: she finally offered her arms, at least in part, because she “was in physical pain” and she “didn’t want to be pepper sprayed again.” Dep. of Imani Brown, 56:11-15. Thereafter, the officers applied only minimal physical force.
The police can, in their discretion, resort to non-lethal, but serious, threats of force, in order to stop (or better yet, prevent) a suspect from resisting arrest. But such a threat will only be effective if officers are permitted to actually use the threatened force. We should not constitutionally require police to back off just because a lawful arrest encounters stubborn physical resistance. Cf. Scott, 550 U.S. at 385-86, 127 S.Ct. 1769 (“[W]e are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people’s lives in danger.... The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness.”) (emphasis omitted). It is eminently reasonable for an officer to (1) warn a resisting suspect that the level of force is about to be marginally escalated, then (2) actually use the force threatened when resistance continues. Reasonableness is all that the Fourth Amendment requires; and reasonableness is a test that, at the safe end, is a *109 matter of law. See, e.g., Tracy, 623 F.3d at 97.
In Tracy v. Freshwater, an arrestee named Tracy got into a struggle with a policeman named Freshwater. Id. at 97-98. The issue critical to the excessive force claim was whether Tracy was already handcuffed when Freshwater pepper-sprayed his face. See id. at 98. We remanded for a trial because “a reasonable juror could [have found] that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force.” Id. (emphasis added). This case is the mirror image of Tracy. We know from the video that Brown , was not “already in handcuffs.” Id. And, as she admitted — and is obvious from the video— she was “offering ... further active resistance,” id., when the officers (1) threatened to use pepper spray, and then (2) made good on that threat.
No material fact is genuinely disputed. No trial is necessary.
Y
As the majority ultimately concedes, there is no “least restrictive alternative” requirement when making an arrest: “Police officers must be entitled to make a reasonable selection among alternative techniques for making an arrest.” Maj. Op. at 103. Certainly, the police are not restricted to the measures and techniques suggested to us in “the peace of a judge’s chambers,” Graham, 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation marks omitted) — pace the majority’s preference for other measures, see Maj. Op. at 98, 98 n. 6, 102.
The majority opinion relies on its weighing of the three Graham factors — a determination that is, as the majority observes, “easier to describe than to make.” Maj. Op. at 102. However, Graham itself confirms that these factors are intended to be a rough guide, and nothing more. They need not all be examined closely in every case; other unlisted factors might be relevant; and the relative importance of any one factor will vary. 490 U.S. at 396, 109 S.Ct. 1865 (“the test of reasonableness ... requires careful attention to the facts and circumstances of each particular case, including ” the three factors) (emphasis added); see also Tracy, 623 F.3d at 96 (in evaluating reasonableness, “we are guided by consideration of at least three factors”) (emphases added). That is because, ultimately, “all that matters is whether [the officer’s] actions were reasonable.” Scott, 550 U.S. at 383, 127 S.Ct. 1769. We consider the Graham factors only to the extent they shed light on whether a particular use of force was reasonable.
The majority emphasizes “the severity of the crime at issue,” Graham, 490 U.S. at 396, 109 S.Ct. 1865, and observes that Brown’s “disorderly conduct offense is subject to a maximum penalty of fifteen days in jail.” Maj. Op. at 102. But unless the Constitution requires the police to free suspects resisting arrest for minor offenses, this factor is of no weight in this case, in which the police began by seeking pedigree information for a summons, and overcame physical resistance by calibrated steps, preceded by warnings, without gratuitous violence.
The one Graham factor that obviously and directly applies here is whether the suspect “is actively resisting arrest.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. That factor is essentially ignored by the majority, which observes dismissively that “Brown was not fleeing, nor physically attacking an officer, nor even making a move that an officer could reasonably interpret as threatening an attack.” Maj. Op. at 102 (internal citations omitted). So? She was *110 also not brushing her teeth. What she was doing, however, was “actively resisting arrest”; and she did that by .physical struggle for as long as she possibly could. ■ Even though this factor is not dispositive (none of the Graham factors is), it strongly supports the use of force here.
The majority also believes that we need a jury to decide whether it was excessive force to wrestle Brown to the ground and then “struggle[] with her” in order to apply handcuffs. See Maj. Op. at 103 (“[A] jury will have to decide whether Fourth Amendment reasonableness was exceeded when Brown was taken to the ground after refusing to put her hands behind her back and when officers struggled with her on the ground and used pepper spray to accomplish handcuffing.”). But the fact that a suspect “actively resist[s] arrest,” by itself, “necessitat[es] a forceful response.” Tracy, 623 F.3d at 97. That includes forcefully bringing her to the sidewalk, the ensuing struggle, and more — as necessary to effect the arrest.
According to the majority, “[n]o reason appears why, with Brown standing, each officer could not have simply held one of her arms, brought it behind her, and put handcuffs on her wrists.” Maj. Op. at 102. But the video shows why the police took her to the ground: Brown refused to give up her hands, and instead grabbed hold of the metal structure of a scaffolding. In her own words: “I was standing there and not offering them my arms.” Dep. of Imani Brown, 50:13-14. The majority has no fair ground for offering technical advice on whether it would have been better and safer if the police had pried back Brown’s fingers one-by-one off the metal bar, or used any other forceful method that might have exposed Brown (or the officers) to different risks. In any event, the relevant question is whether the use of force was objectively reasonable-not whether judges can identify alternative methods. The Constitution does not enforce a preference among techniques short of excessive force.
The only excessive features of this case are the elaborate constitutionalization of the routine arrest of a disorderly individual, the unfair attack on the professional reputation of two NYPD officers, the absurd waste of judicial time that has ensued and will follow on remand, and the imposition on the valuable time of jurors.
APPENDIX
The video begins in the middle of the encounter. Just after 5 a.m., at the intersection of Barclay and Broadway in lower' Manhattan, Brown is standing on a sidewalk. She is facing away from a Starbucks coffee shop, leaning against metal scaffolding. Two NYPD officers, Officer Justin Naimoli and Officer Theodore Plevritis, stand behind her, working to restrain her arms.
Officer Plevritis shouts to a bystander: “No! She’s under arrest!” Brown is holding a cell phone and a purse in her right hand. She pulls her right arm in toward her body, but Officer Naimoli is able to close metal handcuffs around her right wrist. Turning her body 90 degrees to the left, now facing Officer Plevritis, Brown yells: “I just need to use the fucking bathroom!” She slowly unwinds her body, turning back the right, and pulls her left arm free momentarily. Officer Plevritis reaches to pull Brown’s free arm back within reach, telling her, in a measured tone: “Stop moving your arms. Stop resisting, miss. Stop resisting. Miss, stop resisting.”
Brown does not stop resisting. She grabs the metal scaffolding with her free hand. Officer Plevritis reaches down, presumably to pry her grip loose from the scaffold, when she twirls once more, 180 degrees to the right, and steps back toward the Starbucks. Officer Plevritis tells *111 her: “Alright, you are going to the ground now.”
Officer Naimoli starts to apply pressure to the front of her legs, while both officers, standing behind her, push her shoulders forward, well above her center of gravity. Officer Naimoli appears unable to take her to the ground, so Officer Plevritis winds up, and swings his leg forcefully into Brown’s shins. The laws of physics do their work: Brown’s body rotates forward, her waist the approximate pivot point. For an instant, she is parallel to the sidewalk, a few feet off the ground. Then she falls. See Video at 0:20.
The struggle continues. After rolling on the ground a bit, Brown coils into a crouch, knees on the ground, leaning forward. Both officers hover over her back. Officer Plevritis appears to have a solid grasp of Brown’s left arm, and he pulls it up behind her, bent sharply at the elbow. Brown then springs half-way up out of her crouched position, and waddles forward, with both officers holding on to her back and arms. Brown is quiet at this point, but a crowd is gathering, and someone shouts, off-camera: “Officers, can you please let her go? Can you please let her go?” Both officers, sometimes in unison, repeatedly order Brown to give up her hands, and to stop resisting: “Put your han ... Stop it. Stop resisting, Miss. Stop resisting. Stop resisting. Stop resisting. Stop it ma’am. Stop resisting. Stop resisting.”
A voice crackles over the radio, and Officer Plevritis lets go of Brown’s left arm — which remains free of handcuffs — to reach back for the radio on his hip. The crowd growing larger, he calls for assistance: “Can I have another unit over here to this location?” Officer Plevritis tries to regain his grip over Brown’s left arm, but she wriggles free again, and rolls over back to the ground. For a brief moment, Brown tucks her free arm back underneath her body. “Miss, stop resisting.” Brown asks: “What am I doing to you?”
The officers escalate their use of force: Officer Plevritis yells, “Stop it!”, as he strikes Brown in the lower back with his knee. “Don’t kick me,” she says. Officer Naimoli then makes two sweeping movements with his left arm, seemingly trying to dislodge Brown’s grip from her purse, or her cell phone. The phone ends up on the sidewalk, a few feet away. The officers continue to plead with Brown to comply, now employing a louder, more aggressive tone: “Stop resisting! Stop it! Stop resisting!”[3]
Brown continues to struggle with the officers from the ground. The officers are trying to pull her hands together behind her back, so the handcuffs, currently hanging around her right wrist, can be secured to her left. Officer Naimoli says, “Don’t try to bite me!” It is not clear from the video whether, in fact, Brown was trying* to bite anyone, but she responds, exasperated: “I’m not trying to bite you!” For a moment’, Officer Plevritis holds her head against the sidewalk.
Members of the (still growing) crowd chime in from time to time: “What’s the point of doing this?” Then, sarcastically mocking the NYPD’s motto: “Courtesy, *112 Professionalism, Respect!” Officer Naimoli responds in kind: ‘Yep, she’s giving us her respect.”
The struggle continues, and Brown says something like “I’m just trying ... to pull my ... ” — then she tries to rise to a kneeling position. The officers wrestle her back to the ground, and Brown lets out a brief whimper. Officer Plevritis is trying to pull her left arm behind her back, but Brown has it planted securely underneath her body. The officers raise the intensity and the volume of their voices once more: “STOP RESISTING!”
Brown does not stop resisting. She continues to struggle. The officers then threaten to escalate the level of force again, now shouting loudly: “GIVE US YOUR HANDS, OR YOU’RE GONNA GET PEPPER SPRAYED RIGHT NOW! GIVE US YOUR HANDS!” See Video at 1:36.
Brown does not give up her hands. She continues to struggle for the next 8 or 9 seconds — the time it takes Officer Plevritis to reach back and unholster his pepper spray. He sprays Brown in the face, from about a foot away, for about one second. See Video at 1:48.
For a moment, Brown appears to be going back to the ground. Her skirt is off-kilter; her bare buttocks briefly exposed to the gathering crowd. Someone off-camera asks an (inaudible) question, to which Officer Plevritis responds, loud and frustrated: “How about putting her hands behind her back?!” Brown then starts rocking back and forth from her knees, as the crowd pulls in tighter around the struggling trio. Officer Plevritis reacts by letting Brown go, springing to his feet, and yelling at the crowd: “Get away from here! Back up! Back up! Back up! Everyone back up!” Officer Naimoli is now alone in his attempted restraint of the (still-struggling) Brown.
From her knees, Brown continues the rocking motion. Her hands remain in front of her, only her right wrist in cuffs. Officer Plevritis shouts again: “Stop it! Get on the ground!” Brown does not comply. Officer Plevritis, now standing in front of- Brown, warns her: ‘You are gonna get it again.” But Brown’s behavior does not change, and Officer Plevritis sprays her .with pepper spray a second time, again in the face, for less than a second, from a distance that is difficult to discern from the video (no more than one foot). See Video at 2:12. The' officers continue to shout: “Put your hands behind your back! STOP RESISTING! Put your hands behind your back!”
Finally, Brown appears to relent. Someone shouts, off-camera: “You guys are fucking cowards!” At last, the officers secure the handcuffs on Brown’s left wrist.
Two new officers appear on camera, apparently having just arrived on the scene. One shouts loudly and repeatedly at the bystanders (including the camera operator) to move back. Brown is doubled over on her knees. She shouts, presumably to the officers: “Can you please pull my skirt down so I’m not flashing the fucking street please?” One of the officers tells Brown that she “should have thought of that,” and orders her to “stand up.” Brown refuses to cooperate: “No!”, she shouts from the ground. Officers Naimoli and Plevritis forcibly pull her to a standing position, and walk her, now securely handcuffed, to a nearby police cruiser. Another officer is still shouting at the nearby onlookers: “Get back! Move back!” Officer Plevritis orders Brown to “get in the car” and to “sit down in the ear,” as she appears to lean her upper body out of the door. Officer Plevritis forces her back into the seat, and secures the door.
The footage skips ahead a moment, and Brown is lead out of the car by Officers *113 Plevritis and Naimoli, while at least three other officers look on (still at the same interséction). For reasons that are not clear, the handcuffs remain attached to Brown’s right wrist, but now they dangle alone — her left hand is free again. Officer Plevritis asks her to “step out and turn around.” Officer Naimoli tells her to “step out of the car and put your hands behind her back.” This time, Brown turns around without objection, and offers her hands to be re-handcuffed. Officer Plevritis explains: “Now if you would have done this, you wouldn’t have gotten sprayed.” The officers secure the handcuffs, again, and Brown is returned, quietly, to the back seat of the police car.

. The clearest, longest video is available at the following link: http://www.ca2.uscourts.gov/ Docs/Pl’s_Ex% 2018_OWSCraigCard7-65 .- mp4 See Ex. 18 to Decl. of. Joshua S. Moskovitz (‘'Video”). Two shorter videos provide some additional context. See Ex. L to Decl. of Andrew Lucas; Ex. 20 to Decl. of. Joshua S. Moskovitz. All of the video footage is available for download on the "Multimedia Resources” section of the Court website’s “Decisions” page. See http://www.ca2. uscourts.gov/multimedia_resources.html

. In an online chat, Brown admitted: "I resisted arrest.” Ex. 1 to Supp. Decl. of Andrew Lucas. The majority, however, hedges on that point, resorting to scare quotes. See Maj. Op. at 102 ("At most, her ‘resistance’ was a refusal to permit the easy application of handcuffs by placing her hands behind her back.”). Scare quotes or none, any denial that Brown was resisting arrest “is so utterly discredited by the record that no reasonable jury could ... believe [it].” Scott, 550 U.S. at 380, 127 S.Ct. 1769.

. At some point, the camera briefly turns away from the struggle to a friend of Brown's, who describes what happened in the moments preceding the arrest. His commentary is largely irrelevant to the excessive force claim, but it does go a long way to confirming that Brown was one of the individuals banging on the glass — rather than some unfortunate victim of mistaken identity:
She wanted to use the bathroom at Starbucks. She was banging on the door, asking them to use their discretion and let her go to the bathroom, and they called the police on her____