**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3269
_____

RAHEEM JACOBS

v.

CUMBERLAND COUNTY; WARDEN ROBERT
BALICKI; JOHN DOE CORRECTIONS OFFICERS 1-6,
FICTITIOUS INDIVIDUALS; MICHAEL WILLIAMS;
NEIL ARMSTRONG; MICHAEL ANDERSON;
EMANUAL MORRERO; MANUAL VELESQUEZ

Michael Williams,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 16-cv-01523)
District Judge: Honorable Joseph H. Rodriguez
_____

Submitted Under Third Circuit L.A.R. 34.1(a):
December 8, 2020
_____

Before: MCKEE, PORTER, and FISHER,
*Circuit Judges*.

(Filed: August 10, 2021)

_____

A. Michael Barker
Barker Gelfand & James
210 New Road
Linwood Greene, Suite 12
Linwood, NJ 08221

       *Counsel for Appellant Michael Williams*

Kevin P. McCann
Shanna McCann
Chance & McCann
201 West Commerce Street
Bridgeton, NJ 08302

       *Counsel for Defendants Neil Armstrong,*
       *Michael Anderson, Emanual Morrero, and*
       *Manual Velesquez*

Surinder K. Aggarwal
Stone Conroy
25A Hanover Road
Suite 301
Florham Park, NJ 07932

       *Counsel for Appellee Raheem Jacobs*

2

## OPINION OF THE COURT
_____

PORTER, *Circuit Judge*.

Raheem Jacobs got into a fight with another inmate while he was a pretrial detainee at Cumberland County Jail. Several minutes after the fight, a group of corrections officers forcibly removed him from the dorm. Jacobs claims that as the officers removed him, they violated his Fourteenth Amendment right to be free from excessive force amounting to punishment. The officers moved for summary judgment on the ground of qualified immunity. After reviewing the record (including a security video from the dorm) the District Court determined that a reasonable jury could find that the officers used gratuitous force and that any reasonable officer would have known that such force was unlawful. The court thus denied qualified immunity and summary judgment to the officers. One of the officers, Michael Williams, unsuccessfully moved for reconsideration. Williams now appeals. We will affirm both District Court orders.

## I

Jacobs was held in the C dorm of Cumberland County Jail as he awaited trial for a weapons charge. On the morning of February 25, 2015, Jacobs got into a fight with Bruce Hanby, one of the other inmates housed in the C dorm. Less than thirty seconds after the fight ended, a group of corrections officers entered the dorm and identified Hanby as one of the fighters. The officers removed Hanby and took him to the medical unit. About fifteen minutes later, Williams and four of his fellow officers (Neil Armstrong, Michael Anderson, Emanual Morrero, and Manual Velesquez) returned for Jacobs. When

3

the officers arrived, they found Jacobs in the shower. The officers told Jacobs to finish showering, get dressed, and gather his belongings so that they could take him to the medical unit.

As they waited for Jacobs to finish up, the officers standing outside the shower talked and laughed together while other officers chatted with the inmates. After a few minutes, Jacobs exited the shower and returned to his bunk. He donned his jumpsuit and then rummaged through items on his bed for about thirty seconds. The officers continued chatting with each other in an apparently casual manner, but eventually their focus shifted back to Jacobs. Officer Williams started speaking in the direction of Jacobs as Jacobs continued to look through papers and items on his bed. Then, in an instant, Officer Armstrong grabbed Jacobs and pulled him away from the bed as Williams and Anderson approached.

The parties dispute what prompted the officers to descend on Jacobs. Jacobs claims that he was shuffling through papers and searching for his family's phone numbers so that his bunkmate could call the family and let them know what happened. While Jacobs doesn't recall exactly what he and the officers said, he posits that the officers grabbed him because he was "taking too long." App. 153.

The officers tell a different story. Armstrong says that he asked Jacobs if he was looking for a weapon and Jacobs replied, "Maybe." App. 217. Williams never mentioned a weapon in his deposition, but his story is similar. He claims that after he saw Jacobs shuffling through the papers, he said, "[M]y man, get your stuff together, let's go," and immediately approached the bed to get a better view of what Jacobs was searching for. App. 186. As he approached, he asked Jacobs

4

what he had in his hand and Jacobs responded with "something to the effect of F you guys, . . . you guys are crazy." App. 191.

The jail security video recorded no audio, so we cannot determine what was said. But what happened next is clear from the video. After being grabbed by Armstrong, Jacobs did not resist as Armstrong tried to handcuff him. As Jacobs stood compliant with his hands behind his back, Williams approached and stood face to face with Jacobs. Within seconds, Williams delivered a strike to Jacobs's neck and a punch to the side of his head. After the first two blows, Armstrong put Jacobs into a neck hold and forced him to the floor as Williams delivered a backhand slap to Jacobs's face.

The security video failed to fully capture the next two portions of the incident. First, as Armstrong and Jacobs tumbled to the floor, they fell out of the security camera's view. The video shows Officer Anderson dropping to the floor to assist Armstrong, but it does not capture Armstrong's and Anderson's actions during the twenty-second period that Jacobs remained on the floor. According to Jacobs, the officers pinned him to the floor and punched and kneed him as they cuffed his hands behind his back. Second, as Officers Morrero and Armstrong escorted Jacobs to the medical unit, they used an elevator with no security camera. Jacobs alleges that as his hands were still cuffed behind his back the officers threw him face-first into the elevator wall and continued beating him.

On the day of the incident, each officer submitted a use-of-force report. None of the reports mentioned a threat of a weapon or Williams striking Jacobs. Jail and law-enforcement officials opened an investigation and determined that Williams used excessive force. After review, the Cumberland County Prosecutor's Office charged Williams criminally.

5

Jacobs sued the officers under 42 U.S.C. § 1983 and alleged, among other things, that the officers used excessive force in violation of his Eighth and Fourteenth Amendment rights.[1] The officers moved for summary judgment on the ground of qualified immunity. At summary judgment, a district court must construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018). In qualified-immunity cases, that "usually means adopting . . . the plaintiff's version of the facts," *Scott v. Harris*, 550 U.S. 372, 378 (2007), unless "no reasonable jury could believe it," *id.* at 380. But the existence of a security video presents an "added wrinkle." *Id.* at 378. In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is "blatantly contradicted" by the video footage. *Id.* at 380.

Applying those standards, the court first analyzed Williams's conduct. The court noted that several documents from the investigation suggested that Williams's force was excessive. And far from blatantly contradicting Jacobs's version of events, the District Court found that the security video appeared largely consistent with Jacobs's side of the story.

---

[1] Jacobs also filed a § 1983 conspiracy claim against the officers. The District Court denied summary judgment on the conspiracy claim for Officers Anderson, Armstrong, Velesquez, and Williams. Because the conspiracy claim was not addressed in the appellate briefing, we consider the issue forfeited. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

The remaining officers fared no better. Because the security video failed to capture (1) what Jacobs, Williams, and Armstrong said before the incident; (2) what happened on the floor of C dorm; and (3) what happened on the elevator, the court adopted Jacobs's version of those disputed events. Using that version of the facts, the District Court concluded that each use of force violated Jacobs's constitutional rights[2] and that any reasonable officer would have known that such gratuitous force violated clearly established law. After unsuccessfully moving for reconsideration, Officer Williams timely appealed.[3]

II

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction to review the District Court's denial of qualified immunity under 28 U.S.C. § 1291 and the collateral-order doctrine. *Bland*, 900 F.3d at 82. Under the collateral-order doctrine, we have jurisdiction to "review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014) (quoting *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 61 (3d Cir. 2002)). But we lack jurisdiction to "review questions of 'evidence sufficiency.'"

---

[2] The District Court granted summary judgment in favor of Officer Velesquez because it was undisputed that he never touched Jacobs during the incident.

[3] The other officers failed to timely appeal. Although they moved to join Williams's briefing in this case, they never filed a notice of appeal. Accordingly, they are not parties to this appeal. *See* Fed. R. App. P. 3(c)(1)(A); *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 314–15 (1988).

*Blaylock v. City of Philadelphia*, 504 F.3d 405, 409 (3d Cir. 2007) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). "That is, if a district court determines 'that there is sufficient record evidence to support a set of facts under which there would be no immunity,' we must accept that set of facts on interlocutory review." *Id.* (quoting *Schieber v. City of Philadelphia*, 320 F.3d 409, 415 (3d Cir. 2007)). We will thus accept the District Court's rendering of the facts unless it is "blatantly contradicted" by the security video. *Scott*, 550 U.S. at 380.

Given that set of facts, we analyze Officer Williams's qualified-immunity defense de novo. *Bland*, 900 F.3d at 83. Our qualified-immunity analysis consists of two questions: (1) whether this set of facts shows Williams violating a constitutional right, and (2) "whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful.'" *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020) (alteration in original) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011)).

III

Before we can decide whether the evidence depicts a violation of a constitutional right, we must first clarify what constitutional provision governs Jacobs's claims. The Fourth Amendment protects citizens from objectively unreasonable uses of force in the context of arrests, investigatory stops, or any other seizure. *See Graham v. Connor*, 490 U.S. 386, 395–97 (1989). And the Eighth Amendment protects convicted prisoners from any force applied "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers,* 475 U.S. 312, 320–21 (1986) (quoting *Johnson v. Glick*, 481 F.2d

8

1028, 1033 (2d Cir. 1973)). But it is the Due Process Clause of the Fourteenth Amendment[4] that protects pretrial detainees like Jacobs. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

In *Bell*, the Supreme Court explained that "pretrial detainees, who have not been convicted of any crimes, retain *at least* those constitutional rights that we have held are enjoyed by convicted prisoners." *Id.* at 545 (emphasis added). Later, in *Graham*, the Court explained that it was "clear" that the Fourteenth Amendment protects pretrial detainees from "the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n.10. But it was not always clear what the punishment standard entailed.

Courts were left to decide whether the punishment standard was objective (like the Fourth Amendment's objective-reasonableness test) or subjective (like the Eighth Amendment's malicious-and-sadistic standard). For example, in *Fuentes v. Wagner*, we held, in part, that "the Eighth Amendment cruel and unusual punishments standards . . . apply to a pretrial detainee's excessive force claim arising in the context of a prison disturbance." 206 F.3d 335, 347 (3d Cir. 2000) (citations and emphasis omitted). Thus, in the context of a disturbance, we required pretrial detainees to show not only that force was excessive, but also that the force was applied maliciously and sadistically. *Id.* In such a case, the Eighth and Fourteenth Amendment inquiries became identical.

---

[4] The Supreme Court has not yet determined whether pretrial detainees can bring excessive-force claims under the Fourth Amendment. *See Kingsley v. Hendrickson*, 576 U.S. 389, 408 (2015) (Alito, J., dissenting); *Graham*, 490 U.S. at 395 n.10.

In 2015, the Supreme Court clarified that the subjective Eighth Amendment standard does not apply to pretrial detainees. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). "The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Id.* (quoting *Graham*, 490 U.S. at 398 n.11). Instead, the Court held that "a pretrial detainee must show *only* that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97 (emphasis added). The Court thus clarified that the Fourteenth Amendment, like the Fourth, exclusively employs an objective-reasonableness standard.[5]

IV

A

Turning to the question of whether Williams used objectively unreasonable force, "[a] court (judge or jury) cannot apply this standard mechanically." *Id.* at 397. Instead, it requires "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576

---

[5] In doing so, the Court abrogated the portion of *Fuentes* that applied the Eighth Amendment's malicious-and-sadistic standard to pretrial detainees.

U.S. at 397.

We analyze these circumstances "from the perspective of a reasonable officer on the scene." *Id.* Running a jail is "an inordinately difficult undertaking." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). "Safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Kingsley*, 576 U.S. at 399 (internal quotation marks omitted) (quoting *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012)). Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 397).[6] And "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates an inmate's constitutional rights.

[6] As *Kingsley* demonstrates, courts applying the objective standard in the Fourteenth Amendment context may find useful guidance in Fourth Amendment excessive-force cases. *See Kingsley*, 576 U.S. at 397–400. Although the factual scenarios in the two contexts may differ, the Fourteenth Amendment standard is now almost identical to the Fourth Amendment standard. *Compare id.* at 396–97 (the Fourteenth Amendment excessive-force inquiry requires a pretrial detainee to "show only that the force purposely or knowingly used against him was objectively unreasonable"), *with Graham*, 490 U.S. at 397 (the Fourth Amendment excessive-force inquiry asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"); *see also Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 n.2 (2021).

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal quotation marks omitted) (quoting *Johnson*, 481 F.2d at 1033).

Here, even when the circumstances are viewed from the perspective of a reasonable officer, the evidence construed in the light most favorable to Jacobs could lead a reasonable jury to find that Williams used objectively unreasonable force. First, jurors could conclude that Williams and his fellow officers were not facing a disturbance or any other threat to jail security. Although a fight between inmates is a type of jail disturbance, the disturbance subsided well before the officers returned to retrieve Jacobs.[7] After the fight ended, roughly fifteen minutes passed before the officers returned for Jacobs. When they returned, they found the inmates orderly and compliant. Moreover, the security video shows that circumstances were calm as the officers waited for Jacobs to finish getting ready.

A reasonable factfinder could also conclude that Jacobs posed no threat throughout the encounter. The security video shows that Jacobs was standing with his hands behind his back and submitting to Armstrong's compliance hold when Williams approached the bunk. As the District Court observed, a reasonable jury viewing the security footage could find that Williams struck Jacobs while Jacobs was defenseless and obeying orders.

In sum, this version of events does not present a question about the appropriate *degree* of force. Under this set

---

[7] We note that even though the ongoing-disturbance exception in *Fuentes* was not yet abrogated at the time of the officers' conduct, it would still not apply in this case because there was no disturbance when the officers returned for Jacobs.

of facts, a jury could find that there was no penological need for *any* additional force—making each of Williams's strikes wholly gratuitous and objectively unreasonable.[8]

B

As for the second prong of qualified immunity, a government official is protected from suit unless he "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Thomas v. Tice*, 948 F.3d 133, 141 (3d Cir. 2020) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

In each case, we must focus on "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at

---

[8] Of course, Williams has his own side of the story. He claims that he and his fellow officers perceived a legitimate threat because of things Jacobs said. If Williams's version of events were true, that would certainly bear on the reasonableness of his actions. But as we have already explained, we must accept the District Court's presentation of the facts in the light most favorable to Jacobs unless a video "blatantly contradict[s]" that version of the facts. *Scott*, 550 U.S. at 380. Based on the silent video, the only thing we can know for sure is that Jacobs and Williams exchanged words. The dispute over what was said is precisely the type of genuine factual dispute that we lack jurisdiction to review. *See Johnson*, 515 U.S. at 313, 320.

13

742). Thus, the central question is whether the existing law gave the officer "fair warning" that his *particular* conduct was unlawful. *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

Sometimes an officer can receive fair warning if "a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). But in excessive-force cases, it can be difficult for officers to know how previous judicial opinions apply to new, tense situations. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001). The reasonability of force often hinges on the details of an individual case, making the specificity of caselaw "especially important." *Mullenix*, 577 U.S. at 12. In such cases, "officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 577 U.S. at 15). The caselaw does not have to be "directly on point," but existing precedent must have placed the question of unlawfulness "beyond debate." *al-Kidd*, 563 U.S. at 741. Cases with closely analogous facts can thus help "move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 577 U.S. at 18).

Here, Williams's conduct is nowhere near the "hazy border between excessive and acceptable force." *Id.* (quoting *Mullenix*, 577 U.S. at 18). When the evidence is construed in the light most favorable to Jacobs, we have no difficulty concluding that the unlawfulness of the conduct was "beyond

14

debate," *al-Kidd*, 563 U.S. at 741. Any reasonable officer would have known that Williams's strikes were unlawful under this set of facts.

First, the Supreme Court has made clear that officers may not expose inmates to gratuitous force divorced from any legitimate penological purpose. *See Hope*, 536 U.S. at 738; *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). That alone would provide officers with at least "some notice" that the treatment of Jacobs was unlawful. *Hope*, 536 U.S. at 745. Additionally, the specific conduct here—striking a physically restrained and nonthreatening inmate—was clearly unlawful under the precedent of this Court and our sister circuits. *See Giles v. Kearney,* 571 F.3d 318, 326 (3d Cir. 2009) ("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); *Estate of Davis v. Delo,* 115 F.3d 1388, 1394–95 (8th Cir. 1997) ("We agree that the law was well established that striking an unresisting inmate . . . in the head while four other officers were restraining his limbs . . . is a violation of the Eighth Amendment."); *Skrtich v. Thornton,* 280 F.3d 1295, 1303 (11th Cir. 2002) ("By 1998, our precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated."); *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) ("We have little difficulty concluding that in 2009, the time of the incident, it was well-established, in sufficiently similar situations, that officers may not 'use gratuitous force against a prisoner who

15

has already been subdued . . . [or] incapacitated.'" (alteration in original) (quoting *Skrtich*, 280 F.3d at 1303)).[9]

\* \* \*

At the time of the relevant conduct, it was clearly established that officers could not gratuitously beat an inmate. Construing the evidence in the light most favorable to Jacobs, any reasonable officer would have known that the conduct here was unlawful. We will therefore affirm both the District Court order denying summary judgment and the District Court order denying reconsideration to Officer Williams.

---

[9] These cases arose out of the Eighth Amendment context. Together, they show that it was clearly established that Williams's conduct would violate the Eighth Amendment's more stringent malicious-and-sadistic standard. Because the conduct would violate that standard, Jacobs's status as a pretrial detainee simply means that the constitutional violation here is more obvious because "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley*, 576 U.S. at 400 (quoting *Graham*, 490 U.S. at 398 n.11). At the time of Williams's conduct, it was clear that the Fourteenth Amendment protected pretrial detainees from excessive force amounting to punishment. *See Graham*, 490 U.S. at 395 n.10. But even if a reasonable officer could mistakenly believe that the circumstances here were governed by the Eighth Amendment standard (as many jail interactions are) it would not change the outcome because the conduct would violate clearly established law under either standard.