**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 23-2552

RANDY K. WASHINGTON,

Appellant

v.

CHARLES ELLIS, Warden; TIMOTHY FRIEL; JOHN DOE MERCER COUNTY
SHERIFF'S OFFICERS; MERCER COUNTY JAIL MEDICAL STAFF; DEPUTY
WARDEN OLIVER; SGT. TAMAINE GRIER; DR. DEEHAN; LT. ZEGARSKI,
Mercer County Correction Center; LT. LYSZCZAK, Mercer County Correction Center

_____

Appeal from the United States District Court
for the District of New Jersey
(District Court No. 3:17-cv-07243)
District Judge: Honorable Peter G. Sheridan

_____

Argued on November 12, 2024

Before: RESTREPO, MONTGOMERY-REEVES, and AMBRO, *Circuit Judges*

(Opinion filed March 18, 2025)

Yolanda Bromfield **(Argued)**
John D. Haggerty
Gibbons
One Gateway Center
1145 Raymond Plaza West
Newark, NJ  07102

Counsel for Appellant

Paul R. Adezio
John K. Maloney
Michael A. Amantia **(Argued)**
Office of County Counsel
County of Mercer
640 S. Broad Street
P. O. Box 8068
Trenton, NJ  08650

        Counsel for Appellees

_____

OPINION[*]

_____

AMBRO, *Circuit Judge*

After he punched his public defender in open court, Randy Washington was tackled by law-enforcement officers.  Prison officials later provided him medical treatment, and he underwent hand surgery.  He brought three claims based on those events.  First, Washington asserted that officers used excessive force during the takedown.  Second, he claimed that prison staff were deliberately indifferent to his serious medical needs.  Finally, he alleged medical malpractice against the doctor who performed surgery.  The District Court granted summary judgment to the defendants on all these claims.  We vacate in part, affirm in part, and remand.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

# I

Washington alleges the following. While on trial in 2017, he punched his public defender. He then waited for officers in the courtroom to restrain him. They tackled him onto a table and then the ground, using their weight to crush his hand.

Officers then moved him into the hallway adjacent to the courtroom, where Washington claims they threw him against a wall and tightened his handcuffs to inflict additional injury and pain. By the time he got to his holding cell, his hand was "the size of a baseball." JA 656. At this time, he told an officer that his hand was broken. As Washington tells it, his hand appeared "more than swollen" and "obviously fractured." JA 621. Officers then told him to change his clothes and he complied, but was in extreme pain and struggled to do so.

Transportation services brought Washington back to Mercer County Correctional Center (MCCC). He asked to be taken to the hospital, but medical staff and corrections officers denied his request. One officer, Sergeant Timothy Friel, told Washington, "[W]e do not send inmates to the hospital anymore." JA 83. He instead took Washington to the MCCC nurse, who ordered an X-ray and offered him ice. Medical notes indicate Washington showed no acute distress, his hand was swollen, and he refused ice and pain medication. That same day, Washington asked a different officer, Sergeant Tamaine Grier, to take him to the hospital. She did not, instead taking him back to the nurse.

Washington received an X-ray five days later, which showed a hand fracture. Frustrated with his care, he filed grievances with MCCC Warden Charles Ellis and Deputy Warden Phyllis Oliver. Washington explained that he needed to go to the hospital, but that

3

Sergeants Friel and Grier had refused his requests. Warden Ellis directed him back to the medical team.

Dr. Michael Deehan performed surgery on Washington's hand about one month after his injury. During surgery, Dr. Deehan inserted screws and pins into Washington's hand and allegedly told him that they were permanent. Two months later, however, he removed them and provided a "soft cast" for Washington's still-broken hand. JA 64.

Washington brought several claims based on these events. He contended that officers had used excessive force while performing the takedown and while holding him in the hallway, fracturing his hand and subjecting him to unnecessary pain. He also alleged that MCCC staff had been deliberately indifferent to his serious medical needs. After filing his initial complaint, Washington requested appointment of counsel, which a magistrate judge denied. He then amended his complaint to include a claim of medical malpractice based on Dr. Deehan's alleged improper removal of the pins and screws. All defendants moved for summary judgment.

The District Court first granted Dr. Deehan's motion. It reasoned that Washington had failed to file an affidavit from an independent expert stating that his claim had merit, which is required under New Jersey law, or otherwise to demonstrate the obviousness of the purported medical negligence. After that decision, Washington continued to file letters requesting counsel. He also appealed to the District Court the magistrate judge's decision denying appointment of counsel. It found no abuse of discretion in the denial and affirmed.

The Court then entered summary judgment for all the remaining defendants. On Washington's excessive-force claim, it found that video footage of the event contradicted

4

Washington's narrative and was dispositive under *Scott v. Harris*, 550 U.S. 372 (2007) (relying on video footage when it "blatantly contradicts" the non-moving party's narrative). The Court explained:

> [The video] does not show Plaintiff being 'slammed' against the wall. You cannot clearly see Plaintiff's hands or handcuffs. While the video does not appear to show officers twisting or tightening Plaintiff's handcuffs, it does not clearly show that they did not . . . . While it is not totally clear if an officer's knee landed [on] Plaintiff's hand at any point or if an officer tightens Plaintiff's handcuffs in the hallway, it does not appear as though the video evidence would permit a reasonable jury to conclude that Defendants utilized excessive force in violation of the Eighth Amendment.

JA 39-41 (internal citations omitted). The Court also noted the immediate takedown had been necessary and concluded the use of force was objectively reasonable.

Next, the District Court rejected Washington's deliberate-indifference claim. It found he had not shown he was refused treatment or that Deputy Warden Oliver and Warden Ellis had reason to believe medical personnel were failing to treat him.

Now with counsel, Washington appeals the District Court's decisions entering summary judgment for the defendants on his excessive-force, deliberate-indifference, and state-law medical-malpractice claims, as well as its denial of his motion to appoint counsel.

II

We have jurisdiction to review the District Court's final decisions under 28 U.S.C. § 1291. "We exercise plenary review over a grant of summary judgment, viewing the facts in a light most favorable to the nonmoving party, and applying the same standard that guides our district courts." *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A party is entitled to summary judgment only if it "shows that there is no genuine dispute

5

as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A

First, we consider Washington's excessive-force claim. "[D]efendants can . . . win on summary judgment if the district court concludes . . . that the officer's use of force was objectively reasonable." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (internal quotation marks omitted). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (internal quotation marks omitted). A court must consider: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009).

When reviewing motions for summary judgment, courts "must construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion," unless "there is a reliable video depicting the events in question." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 192 (3d Cir. 2021). In that case, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the

6

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

Relying on *Scott*, the District Court concluded it did "not appear as though the video evidence would permit a reasonable jury to conclude that Defendants utilized excessive force in violation of the Eighth Amendment." JA 41. Washington argues that this was error because the video is too unreliable for the District Court to have credited it. In his view, the District Court should have instead construed the record in his favor. He is correct.

In *Scott*, "the Court had before it a videotape of undisputed authenticity depicting all of the defendant's conduct and all of the necessary context that would allow the Court to assess the reasonableness of that conduct." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007). The video "clearly supported" one version of events and "blatantly contradicted" the other. *Id.* (internal quotation marks omitted). Given the blatant contradiction, no reasonable jury could have credited the defendant's version of events. Only then could the Court decline to "construe the evidence and draw all reasonable inferences" in the defendant's favor. *Jacobs*, 8 F.4th at 192.

There is no such contradiction here. Washington argued he "heard a popping sound when he was on the ground." JA 654. Later, officers in the hallway twisted his hand to hurt him, "bending back [his] hand [a]nd squeezing the cuffs tighter." JA 396. The video the District Court relied on does not blatantly contradict those allegations. The video, which is grainy and has no sound, shows the takedown from a distance and at an angle that make it difficult to distinguish Washington's body from the officers' bodies. It neither supports nor blatantly contradicts his allegations because it does not clearly depict those

7

events. At the summary-judgment stage, the District Court was therefore bound to take the facts (given all the evidence before it, including Washington's testimony) in the light most favorable to Washington. *Jacobs*, 8 F.4th at 192.

The District Court also explained that the video does not prove "an officer sadistically and maliciously came down on Plaintiff's hand to break it" and it was "not totally clear if an officer's knee landed [on] Plaintiff's hand at any point or if an officer tightens Plaintiff's handcuffs in the hallway." JA 41. True enough. But granting the defendants' motion for summary judgment on that basis misapplies *Scott*. The question is not whether "the video evidence" *alone* "would permit a reasonable jury to conclude that Defendants utilized excessive force," JA 41, but whether a trial court can disregard all of Washington's version of events because of discrete contradictions (even blatant ones) between the video and his narrative. *Scott*, 550 U.S. at 380. As we explained, it may not.

The Government points out that the video casts doubt on several aspects of Washington's narrative. For example, Washington alleges his hand was the size of a baseball, yet his hands do not appear swollen in the video. And based on the dexterity with which Washington buttons his shirt in the video, it does not appear he was in "severe pain," as alleged. JA 620. The officers did not tackle him "on[to] the table," JA 124, nor did they appear to slam him up against the wall in the hallway. Given these contradictions, the Government argues "[t]he videos completely discredit and contradict Appellant's version of the events in the courtroom." Gov't Br. 8.

Although the video casts doubt on several aspects of Washington's testimony, using these discrepancies to discredit the entire narrative involves credibility determinations and

8

evidence weighing that are impermissible at the summary-judgment stage. *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence."). We therefore vacate and remand for the District Court to reevaluate the evidence—including the video and relevant testimonies—construing all of it in Washington's favor.

B

Second, we address Washington's deliberate-indifference claim. To succeed on this claim, a plaintiff must prove that an official "(1) knows of [the plaintiff's] need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents [the plaintiff] from receiving needed or recommended medical treatment." *Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (internal quotation marks omitted).

None of Washington's allegations suffice to move his claim past the summary-judgment stage. As to Sergeants Friel and Grier, Washington argues he asked for "immediate medical attention" at the courthouse, JA 603, and to be taken to the hospital, but Sergeants Friel and Grier would only take him to the MCCC nurse. As to MCCC medical staff, Washington contends that he told the nurses he wanted to go to the hospital and pushed the issue. He questions the nurse's decision to order an X-ray but not take him to the hospital, arguing that he required immediate medical attention.

Even if all that were true, "mere disagreement as to the proper medical treatment" cannot by itself establish an Eighth Amendment claim. *Spruill v. Gillis*, 372 F.3d 218, 235

(3d Cir. 2004) (internal quotation marks and brackets omitted). Sergeants Friel and Grier did bring Washington to medical professionals—just not those he hoped to see. Likewise, the medical staff did provide medical attention—ordering an X-ray and providing ice.[1] Medical malpractice or an "inadvertent failure to provide adequate medical care" do not constitute deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). What is more, "when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017). "[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And "we must 'disavow any attempt to second-guess the propriety or adequacy of [their] particular course of treatment' so long as it 'remains a question of sound professional judgment.'" *Pearson*, 850 F.3d at 538 (quoting *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)) (brackets in original). Washington's disagreement with the appropriateness of the treatment he received cannot alone establish a deliberate indifference claim.

As to Wardens Oliver and Ellis, Washington alleges that he informed them of his hand injury and complained about his hand for several weeks before he received surgery. But "[i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372

---

[1]   The Government submits the nurse's notes indicating that Washington was also provided pain medication, but Washington argues he was not. Taking all inferences in Washington's favor, we assume he was not provided pain medication.

F.3d at 236. "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference." *Id.* And the Wardens' "written responses to [Washington's] grievance[s]"—directing him to the medical staff— "show that the prison officials ensured that [Washington] was under the care of medical personnel and being treated, and therefore that the officials were not deliberately indifferent." *Parkell*, 833 F.3d at 337.

We thus affirm the District Court's entry of summary judgment for all the defendants on Washington's deliberate indifference claim.

C

Finally, we address Washington's medical-malpractice claim. The District Court granted Dr. Deehan's motion for summary judgment because Washington had failed to file an affidavit of merit or otherwise to demonstrate the obviousness of Dr. Deehan's purported medical negligence. An affidavit of merit is an independent expert's attestation to the strength of a medical-malpractice claim. N.J. Stat. Ann. §§ 2A:53A-27, 2A:53A-29. It is required to sustain such a claim unless common knowledge would enable a layperson to determine the medical negligence. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 579 (3d Cir. 2003).

A magistrate judge denied Washington's motion to appoint counsel before his complaint included the malpractice claim, so an affidavit of merit was not at issue. And after Dr. Deehan argued that Washington was required to submit an affidavit of merit, Washington sent multiple letters to the District Court. He explained he needed counsel

11

because "counsel ha[s] a much better opportunity to obtain an expert th[a]n an indigent prisoner." D.C. Dkt. No. 100 at 2. Without acknowledging those letters, the District Court resolved the medical-malpractice claim against Washington. Only later did it examine and affirm the magistrate judge's denial of his request for counsel. It thus appears never to have considered Washington's arguments about the need for an expert witness to support his medical-malpractice claim and his difficulty obtaining one. Especially in light of his *pro se* status, it should have considered the arguments in his letters.

We therefore vacate the District Court's grant of summary judgment for Dr. Deehan and remand with instructions for it to consider anew Washington's request for counsel. As the Court did when it denied his initial request, it must determine whether the case "has arguable merit in fact and law." *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993). If so, it should consider "(1) the plaintiff's ability to present his or her own case; (2) the complexity of the legal issues; (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation; (4) the amount a case is likely to turn on credibility determinations; (5) whether the case will require the testimony of expert witnesses; [and] (6) whether the plaintiff can attain and afford counsel on his own behalf." *Parham v. Johnson*, 126 F.3d 454, 457 (3d Cir. 1997).

\* \* \* \*

We vacate in part, affirm in part, and remand for further proceedings consistent with this opinion.